Argued January 13; petitioner disbarred March 9; rehearing
denied April 27, 1943

## In Re SMITH
(134 P. (2d) 956)

Before BAILEY, Chief Justice, and ROSSMAN, LUSK,
BRAND and HAY, Associate Justices.

*Ralph E. Moody,* of Salem (Earl F. Bernard, of
Portland, and W. C. Winslow, of Salem, on the brief),
for petitioner.

*Eugene Marsh,* of McMinnville, for Oregon State
Bar.

LUSK, J.  This is a disbarment proceeding growing out of charges of unprofessional conduct filed by the Oregon State Bar against the petitioner, Guy O. Smith, an attorney of this court with offices in Salem, Marion County, Oregon. The charges are based upon the alleged conversion by Smith of a client's money.

The evidence discloses the following facts: In the month of December, 1936, Smith was employed by John B. Hudson, an Indian living at Grande Ronde, Oregon, to enforce collection of a promissory note for $290, executed in Hudson's favor by T. W. Bemish and R. B. Murray. Smith brought action on the note in the Circuit Court for Marion County, the defendants defaulted, and on January 9, 1937, a judgment was entered against them for the principal sum of the note, together with interest, costs, and attorney's fees. On July 14, 1937, Smith wrote to Hudson that Donald Young, an attorney representing Bemish, had offered to pay the sum of $250 in settlement of the claim against Bemish, the judgment still to stand against Murray, and asked for Hudson's instructions. Hudson, through his daughter, authorized the proposed settlement, but, for some reason not explained by the record, Young, on August 27, 1937, paid Smith $325 in full settlement of the judgment. The payment was made by the check of Donald Young, Trustee, which Smith endorsed and turned over to his stenographer, Miss Grace Miller, to cash. The check was paid by the bank on which it was drawn on August 27, 1937, and bears the endorsement of Miss Miller as well as that of Smith. On the same day Smith executed and filed with the county clerk of Marion County a document acknowledging full satisfaction of the judgment.

Instead of remitting to his client Smith kept the proceeds of the check. Nearly three months later, on

November 19, 1937, he paid $30 to Hudson's daughter. The record is obscure as to where or under what circumstances this payment was made. Thereafter, over a period of more than two years, Smith represented to Hudson from time to time, both in writing and by word of mouth, that he had been unable to collect the judgment notwithstanding the strenuous efforts he was making to that end. The writings consist of nineteen letters and one postcard, the first dated November 23, 1937, and the last December 9, 1939. The burden of these communications, which we deem it unnecessary to set out *in extenso*, was that Smith was expecting payment of the judgment from some third person, at first not named, but who later on was identified as ''Swartz'' and still later as ''Mrs. Paign'', that these individuals had been garnisheed and were making repeated promises to pay the judgment out of the proceeds of the sale of some hops, and as often failing to make good. On March 4, 1938, Smith wrote Hudson: ''I have finally been able to get $25.00 on your garnishee'', and enclosed a check for that amount, and on October 29, 1938, he made a remittance for a like amount saying, ''I am sure that another payment will be made in the next two weeks, and I hope that we can get it all in a short time.'' Prior to this, apparently on January 27, 1938, Smith paid Hudson $10 in currency, and, on that occasion, according to the latter's uncontradicted testimony, told Hudson about a man who was to pay the judgment when he sold the hops, and when Hudson asked for the address of this man Smith said, ''No, he is in the hospital and ain't allowed no visitors, but the hop buyers are in town and will buy the hops and next week I will send you the money.'' The only other remittances made by Smith were $15 on November 18, 1939, and $10 on December 19, 1939, which he wrote, in letters of those

dates, that he was "advancing" to Hudson. At the time Hudson discovered the facts Smith had paid him $115 of the $325 which Smith received from Young.

On December 29, 1939, Jack Anderson, an agent in the United States Indian Service, accompanied by Hudson and at the latter's request, interviewed Smith in his office regarding the matter, and was informed by Smith that he had been unable to collect the judgment; that Mrs. Esther Paine owed Bemish, one of the makers of the note to Hudson, the sum of approximately $150; that he had commenced garnishment proceedings against Mrs. Paine, and had hopes of collecting from her when some hops were sold in which Mrs. Paine had an interest. He gave Anderson Mrs. Paine's address in Salem. Anderson asked leave to see the note—which was not surrendered at the time the judgment was paid—but Smith told him that the note was at his home, explaining that his wife did the bookkeeping for him, and further said that he was not able to state how much had been paid on the note. Anderson then went to the courthouse, examined the files in the case of *Hudson v. Bemish*, and discovered the satisfaction of judgment which Smith had executed. Later on the same day Smith reached Anderson by phone in the district attorney's office and told Anderson that on going through his files he had found that the suit had been settled. On the next day Smith went with his wife to Grande Ronde and paid Hudson $208.93, the balance due on the moneys paid to Smith by Young. The check was drawn by Mrs. Smith, who signed it "Friede M. Oehler, Special".

It appears from Smith's testimony that shortly after Anderson and Hudson left his office he went to the clerk's office to file some papers, and while there

observed the file in the case of *Hudson v. Bemish* lying on the counter, examined the papers therein, and came upon the satisfaction of the judgment.

Confronted with evidence of the foregoing facts at the hearing, Smith's defense was in substance that he forgot that Young had paid him and forgot that he had executed a satisfaction of the judgment, and actually believed that Mrs. Esther Paine was indebted to Bemish and Murray, and that he had instituted garnishment proceedings against her, and was expecting, as he had assured Hudson, to collect the amount of the judgment from her.

It is established as a fact that Mrs. Paine, a sister of Ralph Schwartz—evidently the "Swartz" referred to in one of Smith's letters—did owe the sum of $190, not to Bemish and Murray, but to Smith, to whom she had given her promissory note. Smith had never instituted a garnishment proceeding against her or Schwartz. But it is his testimony that, in some unaccountable fashion, he got Mrs. Paine's indebtedness to himself mixed up with the Hudson case, and thought that when he was pressing her for payment or receiving from her a payment on account, he was acting, not for himself or to collect his own debt, but for Hudson in the collection of moneys owing by Mrs. Paine to one of Hudson's debtors. He seeks to support this story by the fact that on two or three occasions, when he collected small sums from Mrs. Paine, he remitted like amounts to Hudson; and he swore that he lost the note Mrs. Paine gave him and forgot that she was indebted to him.

Smith testified that his office copy of the satisfaction of judgment, as he subsequently discovered, was inadvertently placed in a file of miscellaneous papers

instead of in the file in the case of *Hudson v. Bemish.*
He admitted having told Anderson that the Bemish-
Murray note was at his home, but swore that he found
it later in an envelope folded up in the file in his office.

Asked by his counsel to explain what became of the
$350 which Young paid him, Smith testified that
he had "made every effort possible to try to locate
where this money went, and haven't the slightest idea",
and, further, "It is my idea that I must have used it,
knowing that I had the money and thinking I would go
home and tell my wife and she would send the money
from our other funds, and I never told her."

Smith had no bank account, but kept his own money
and that of his clients in an account in the maiden name
of his wife, with the word "Special" added. It was his
custom, he testified, to turn over moneys which he
received to his wife, who deposited them in this account
and was the only person authorized to draw checks
against it. Before their marriage she had worked in his
office and continued thereafter to act as his bookkeeper.
He concedes that the $325 he collected from Young was
not delivered to Mrs. Smith, and it does not appear
that any of the payments he made to Hudson prior to
the last one were made with checks drawn by her.

Some point is made in the brief on behalf of Smith
that he received the money in payment of the judgment
only "constructively", apparently because no one testi-
fied directly that the proceeds of Young's check, after
it was cashed by Miss Miller, were delivered to Smith.
To this it need only be said that the sworn answer filed
by Smith in these proceedings admits the allegation in
the complaint of the Oregon State Bar that he received
from Donald A. Young, Trustee, the sum of $325 in
full settlement of the judgment; that Smith, in his testi-

mony above quoted, virtually admitted that he received the money though unable to explain how he had disposed of it; and that he was at pains to absolve Miss Miller, the only other person concerned in the handling of the check, from any suspicion or imputation of wrongdoing.

The complaint contains three charges—first, that Smith failed, neglected and refused to advise Hudson that the sum of $325 had been collected for Hudson and the judgment satisfied, and knowingly, wilfully, falsely, and corruptly represented to Hudson that he had been unable to collect the money; second, that Smith wilfully, unlawfully, and feloniously converted to his own use and benefit said sum of $325 or so much thereof as was not represented by a reasonable attorney's fee; and, third, that Smith's conduct was unethical and unlawful and in violation of the statutes of the state of Oregon and the rules of professional conduct of the Oregon State Bar, and constitute such conduct that if the said Smith were now applying for admission to the Bar his application should be denied.

Both the trial committee and the Board of Governors of the Oregon State Bar found the accused guilty of all the charges, and we are of the opinion that their findings are amply supported by the evidence.

None but the most gullible, we think, would swallow Smith's story. Nine able and experienced lawyers—the three members of the trial committee who saw him on the witness stand and heard him testify, and six members of the Board of Governors who reviewed the case —rejected it, and so do we. The strange mental blackout which he claims to have experienced involved forgetfulness not only of the payment of $325 by Young and his execution of a satisfaction of the Hudson judgment, but

of Mrs. Paine's indebtedness to himself as well. Should he remember any of these facts his story could not hang together, and on top of this it became necessary to invent a garnishment proceeding which never had any existence save in his own imagination. It became expedient for him, also, to misplace or lose all documents which might have jogged his erring memory during the period of two years or more which elapsed before his defalcation was brought to light, and so, according to his testimony, his office copy of the satisfaction of the judgment got into the wrong file, he was unable to find Hudson's note from Bemish and Murray, and lost the note which Mrs. Paine gave him. For some unexplained reason, in this instance he departed from his usual business practice and did not turn over the Young check or its proceeds to his wife, and there is no evidence that any of the payments he made to Hudson prior to the last were made with checks drawn on his wife's bank account. Manifestly he withheld from Mrs. Smith knowledge of this transaction.

We see no reason for laboring the matter further or referring to other facts in the evidence which accentuate the improbabilities inherent in Smith's attempted defense. The only possible conclusion is that he wilfully converted his client's money, wilfully deceived his client over a period of more than two years, and at the last, when called to account by the Oregon State Bar, sought in his sworn testimony to exculpate himself by an obvious fabrication.

It remains to determine the penalty. The Board of Governors has recommended that the accused be suspended from the practice of law for two years. It is our opinion that he is guilty of unprofessional conduct which, in view of all the relevant facts, warrants his

disbarment. We have come to this conclusion after giving due consideration to the fact of full reparation, to the evidence regarding the accused's reputation and many years of practice at the Bar, and to the recommendation of the Board of Governors. The evidence would have supported a verdict of guilty of embezzlement. The numerous letters to Hudson were obviously written for the purpose of forestalling an investigation; and there can be no doubt that the accused finally paid Hudson what was due him only under compulsion of the fear of the consequences induced by his knowledge that his wrongdoing had been discovered. We think that reparation under those circumstances should not weigh very heavily in his favor. Some of the evidence of good reputation which he produced creates a doubt upon that subject, while his invention of a defense to the charges and his attempt to establish it by sworn testimony, in violation of his oath as a witness and as an attorney of this court, aggravates the offense and strongly suggests that whatever of good reputation he may have enjoyed was not earned.

■ The recommendation of the Board of Governors is entitled to much weight. But we should bear in mind that, while theirs is the power of recommendation, ours is the duty of judgment. We cannot evade the ultimate responsibility in a case of this character, of rendering a decision which will tend to the preservation of the high standards of honorable conduct which we profess. If the courts balance those standards too lightly in the scales against the plea for indulgence of a lawyer's offense, they and the profession run the risk of justly forfeiting the respect and confidence of the public.

■ The obligation of a lawyer to his client, the courts, and the public is no ordinary one, but demands

honor the most punctilious in the discharge of all his professional duties. During recent years both Bar associations and the courts have become increasingly aware of their duty, not only to deny the high privilege of ministering at the altar of justice to applicants who are unable to demonstrate that they possess the requisite qualifications of character, but, as well, to withdraw that privilege from those who, having been granted it, prove themselves unworthy of their trust. In neither case is the court's office that of punishment. In both it is vindication of ethical standards and protection of the legal profession and the public.

We think it unnecessary to cite authority for the propriety of a judgment of disbarment under the facts of the instant case, but if it were, reference to the recent decision by a unanimous court in the case of *In re Schmalz*, 169 Or. 518, 129 P. (2d) 825, should suffice.

It is the judgment of the court that the petitioner be disbarred from the practice of law in this state.

BELT and KELLY, JJ., deeming themselves disqualified, did not participate in the consideration or decision of this case.

———

ROSSMAN, J. (dissenting). I have read the record carefully and am convinced that we ought to go no further than to embrace the recommendations made by the trial committee and the board of governors; that is, suspend the accused for two years from the practice of law.

In resorting to complete disbarment, the majority indicate that they would have imposed a smaller penalty had the accused not given the explanation of his conduct which he made from the witness stand. Although I

do not believe his explanation, I do not think that all of it is false. Augmenting the penalty on account of the explanation, I believe, is unwarranted. It is worthy of note that the answer filed by the defendant confessed virtually all of the facts upon which the charges against him are grounded; that is, he admitted that Hudson employed him to collect the note; that at the time of the employment $20 was advanced to defray expenses; that later an action was instituted upon the note; that still later a judgment was recovered; that August 27, 1937, the accused signed and filed a satisfaction; that, concurrently with the filing of the satisfaction, the accused received from Donald A. Young $325 in full satisfaction of the judgment; and that still later, extending over a period of two and one-half years, he paid Hudson the small sums that are enumerated in the complaint. They total $115 and are mentioned in the majority opinion. By necessary implication, the defendant admitted that he kept all of the $325 which he received from Young except the $115 which he had remitted to his client. Thus, he virtually confessed that he converted Hudson's money to his (the accused's) own use.

As a witness, the accused freely conceded that he wrote the letters to Hudson which the majority describe. Possibly it is worthy of mention that he exculpated everyone else from responsibility for his wrong. He assumed full blame himself. His stenographer is the one that cashed Mr. Young's check and hers is the last endorsement upon it. She was in South America at the time of the trial, and, had he cared to shift blame upon someone else, she seemingly would have been a ready victim. But the accused took pains to make it clear that she was a woman of excellent character and that he did not want anyone to believe

that she had done any wrong with the check or its proceeds. He likewise stated repeatedly that, contrary to his general practice, the $325 check and its proceeds never reached his wife's hands. In view of these circumstances, and the fact that I cannot say that his explanation (that he had confused this transaction with a debt owing him by Ralph Schwartz and the latter's sister, Mrs. Esther Paine) is wholly untrue, I cannot concur in imposing an increased penalty on account of the explanation.

"It is easier to discover a deficiency in individuals, in states, and in Providence, than to see their real import and value." So said a sage years ago. Let us endeavor to discover the real import of the deficiency in the defendant's character upon which the majority depend for complete disbarment.

Mr. Smith is sixty-one years of age. Since 1910 he has practiced law continuously in the city of Salem. His practice has been fairly large and, according to the record, he handled large sums of money belonging to clients. In the period of nine years, for which figures were supplied, the sums ran into hundreds of thousands of dollars. Some of this money was left with him for investment and other sums came to him as the result of the collection of claims, judgments and other items. In this period of more than thirty years the local grievance committee twice received complaints against Smith. Upon investigation each charge was found to be without support and each was dismissed. A matter of no slight importance is the fact that the accused's professional associations have been good. Twice he has had a partner each of whom was a lawyer who would be a credit to any firm. The one partnership was dissolved when the other member to it received a high judicial

position, and the second was dissolved when the other partner became general counsel for a large corporation in Portland.

Four members of the bar of very high standing testified that the defendant's reputation as a practicing attorney was good. Each had known Smith for more than a score of years, and more than one of them swore that his reputation for integrity was likewise good. This testimony was neither questioned nor controverted. There is nothing about the accused that suggests that he is grasping, vicious or deficient in general standards. He is the father of three boys who would be a credit to any man. Their mother died when the eldest was scarcely more than a boy. The wife mentioned by the majority was married to the accused some time later.

As I have said, Mr. Smith has practiced his profession in the city of Salem for close to a third of a century of time. Had he done any wrong warranting discipline, his guilt would surely have been discovered. The fact that this is the first instance in which a finding of guilt is warranted is an indication that there is nothing seriously wrong with the accused's character.

I agree with the majority that in imposing a penalty we ought to handle this case in such a way that public confidence in the bar will be warranted. That is what this court seeks to do in every disbarment proceeding. Nevertheless, as our reports show, complete disbarment is rarely imposed. In all instances this court has been guided by the principle that in the imposition of a penalty, as in the discharge of all judicial functions, our primary duty is to be just.

The question, therefore, is: What does justice to the public, as well as to the defendant, demand should

be done in this case? How grave is the deficiency in the defendant's character that the above-reviewed circumstances reveal? How it happened that the accused, on August 27, 1937, departed from the fairly high standards to which he had been faithful for more than a quarter of a century, I do not know. On that day he converted to his own use $325, less such part of it as he was entitled to keep as his fee. Previously he had faithfully handled hundreds of thousands of dollars. It has been said: "The greatest flaw in life is that it is always imperfect." Possibly that is the explanation for Smith's breach of his duty as a lawyer.

Undoubtedly, the pendency of this proceeding, which was begun three years ago, has already cost the accused many clients. In fact, the record indicates that a contract which he possessed with the Coast Indian tribes to represent them in an important claim against the United States government was canceled when this proceeding was instituted. A government agent assumed the initiative in the cancelation of the contract. Smith had already performed much work under that contract, which was contingent in nature, and it may be that that contract held out the greatest hopes for a large fee that Smith was ever warranted in indulging. The loss of that contract is, in itself, a penalty of major size.

Full reparation has been made, and Hudson, the victim of the wrong, asks for no penalty upon Smith.

In the imposition of a penalty, as in appraising the value of a life, we ought to take into consideration, not a single act which is under criticism, but the life as a whole that was led by the person under scrutiny. When we balance the misdeed under investigation against the many years of reputable conduct which Smith led, I do

not believe that complete disbarment is warranted. He is now sixty-one years of age. At the end of two years he will be approaching sixty-four. The chances of a sixty-four-year-old man accumulating a practice at the end of two years of suspension are meager. In all likelihood, as he looks back upon this incident and recalls the professional career which he had visioned for himself on the day he was admitted to the bar, he must be visited by a sense of humility and frustration.

It appears to me that we ought to follow the recommendations of the trial committee and of the Board of Governors. Our statutes expressly contemplate that those two bodies shall make recommendations. See §§ 47-213 and 47-216, O. C. L. A. I, therefore, dissent from the disposition which the majority propose to make of this case.