Argued December 6, 1971, accused suspended February 24,
petition for rehearing denied May 24, 1972

In re Complaint as to the Conduct of
NEIL BROWN, *Accused.*
493 P2d 1376
497 P2d 668

*William G. Wheatley,* Eugene, argued the cause
for accused. On the briefs was John E. Jaqua, Eugene.

*Harold D. Gillis,* Eugene, argued the cause for

Oregon State Bar. With him on the brief was Jon A. Joseph, Eugene.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, and BRYSON, Justices.

PER CURIAM.

This is a disciplinary proceeding by the Oregon State Bar charging the accused with unethical conduct. Most of the charges in the complaint arise out of the accused's acts, or failure to act, while serving as attorney and administrator in Lane County, Oregon, of the estates of Robert and Marion Beach and their two sons.

Mr. and Mrs. Beach and their two sons died intestate as a result of an airplane accident on January 28, 1957, and left a 20-year-old daughter, Garnet Claire Beach Ratley (hereinafter referred to as Garnet), as their sole heir.

The deceased parents were engaged in four sawmill and timber operations in Oregon at the time of their deaths. Two of the businesses were Oregon corporations, of which they owned all of the corporate shares, and two were conducted as partnerships. They also had an interest in and operated a timber, logging, and sawmill business in Siskiyou County, California.

The accused had been a friend of the deceased parents. He was appointed administrator of each of the four estates on January 9, 1958, upon the petition of Garnet, the sole surviving heir, who was then married and living in Mt. Shasta, California. As administrator, he acted as president of the two Oregon corporations and managed the partnership businesses.

The deceased parents also owned a 50 per cent interest in the Oakridge Funeral Home, including the real property, in partnership with Mr. and Mrs. Dewey Mattie. In 1965, the accused, as administrator, sold the estates' 50 per cent interest to the surviving partners for $10,872.74 cash and a secured promissory note in the amount of $8,564.24.

Dr. Ratley, a dentist, and husband of Garnet, was appointed administrator of the deceased parents' estates in ancillary probate proceedings in Siskiyou County, California. However, the accused made numerous trips to California and participated in an attempt to unravel the affairs of the California operation.

At the time of the deaths of the four members of the Beach family, most of the interested parties, including the accused, believed that the assets of the deceased parents were of substantial value. The value of the California operation and timber holdings was believed to be close to "a million dollars." Within a few months the accused learned that much of the machinery and assets of the Oregon operations had been transferred to the California undertaking, and that the Oregon businesses (corporations and partnerships) were not profitable. He managed to terminate an unfavorable contract with the Bohemia Lumber Company and liquidated the assets of the Oregon logging ventures. The estates of the two deceased sons were of nominal value. Inventories in each of the parents' estates were not filed until December 9, 1960.

In November, 1959, Dr. Ratley petitioned the Superior Court in California to terminate the ancillary probate proceedings on the basis that the assets in California were worthless. As early as October 25,

1960, Twin City Lumber Co., a major creditor of the California operation, filed a petition in Lane County, Oregon, to have the accused removed as administrator of the estate of Robert G. Beach. The court denied the petition after hearing argument of counsel "provided that the Administrator, Neil Brown, file with this Court by the 9th day of December, 1960, an Inventory and Appraisement in the above-entitled estate and proceed with diligence in the further administration of said estate." Prior to the filing of the inventory, the accused, as administrator, had petitioned and secured an order confirming the sale of certain of the assets of the two Beach estates. The final accounts in each of the parents' estates were not filed until July 18, 1969, eleven and one-half years after the accused had been granted letters of administration. By the time the accused had filed his 1961 account in the estates, $18,000 had been paid to Twin City Lumber Co. on their claim filed in the Oregon probate proceedings. A total of $51,000 was paid to this California creditor, $12,000 of which was paid by the accused from his personal funds and the balance from assets of the Oregon estates. Numerous other creditors filed claims against the Oregon estates but they were not paid "because of the statute of limitations."

Garnet separated from her husband, Dr. Ratley, and moved to Eugene to attend the University of Oregon in 1962. In a deposition of Garnet taken on July 2, 1968, and received as an exhibit in the proceedings before the trial committee, she testified that she tried to get the accused to close the estates as early as the spring of 1962 and she could never find out why they were not closed. The accused was questioned regarding his financial problems and he stated, "Well, there isn't any doubt about that. I was over-extended." The ac-

cused further testified that Garnet knew he was in need of money and that she offered to borrow some money against certain securities that she owned and make it available to him. He took her to the main branch of the United States National Bank and introduced her to a Mr. Arthur Pullen, and told Mr. Pullen that the purpose of the loan was for Garnet to give him some money. Garnet borrowed a total of $25,000 by December, 1963, which she delivered to him and he deposited the same in his personal account. He also testified that before making this loan he advised her to consult with other counsel and gave her the names of three lawyers. However, he did not know if she consulted with any of them. She pledged her securities with the bank to borrow the $25,000. Her loan to the accused was unsecured and was not evidenced by any writing. He did agree to pay the interest on her notes to the bank but at least two of the interest payments were made from assets of the estate in the amount of $1,865.56. The accused had made commitments to purchase two pieces of land, one north of Coburg, Oregon, and the other south of "Spencer Butte." The $25,000 was used for payment on these two pieces of property. The short term notes executed by Garnet were renewed by the bank from time to time. Duplicate notices of interest due on the notes were sent to Garnet and to the accused. The notes were not paid for five years and this indirectly resulted in Garnet bringing action against the accused to recover the amount of the loan. This action was settled in the latter part of 1968. The settlement was effected by counsel for respective sides. The settlement required the accused to pay $13,111.22 to the United States National Bank of Oregon on account of the Garnet notes, and $6,888.78 to Garnet. The accused was given credit for $12,000, the sum he

claimed to have personally advanced on behalf of the estates to settle claims by estate creditors in California. In this connection, the accused took an "Assignment of Interest in Estate" from Garnet of "all of her right, title and interest" remaining in the estates of Marion J. Beach and Robert G. Beach, deceased. The above facts are either admitted or the testimony of the accused confirms the same.

The Bar charged the accused with eleven causes of complaint, setting forth various acts of misconduct and unethical practice. Nine of the complaints arise out of the accused's mishandling of and failure to wind up the affairs of the four estates. The Board of Governors, nine voting, found the accused guilty as charged in seven of the causes of complaint. The accused appeals, arguing that the most that can be said against him is that he is guilty of procedural violations in his administration of the estates.

We cannot agree with this conclusion. The accused, on testimony before the trial committee, admits to his unexplained misconduct as an attorney. This is particularly so when judged in the light of his acting as a fiduciary and administrator of four estates.

The accused's troubles began when he arbitrarily, without approval of the circuit court, attempted to continue the logging and sawmill operations of the deceased Robert and Marion Beach, and to deal personally with the partnership and corporate ventures. Several of the acts, or failure to act, charged by the Bar are used to support and are intermingled in the causes of complaint. The Bar charges that the accused willfully failed to obey directions of the Lane County Circuit Court, and further failed to show said court and its judges the respect, candor, and cooperation required of a member of the Oregon State Bar.

On five occasions between December 23, 1968, and July 15, 1969, the Lane County Circuit Court directed the accused, by letter, to appear at a time certain concerning the status of the two parents' estates and the filing of final accounts in each estate. In response to the first notice on December 23, the accused appeared and advised the court that both estates were ready for closing and there remained only the preparation of the final account. Thereafter, he failed to comply with the court's written requests on each occasion. The estates, at this time, were eleven and one-half years in probate.

This action and lack of respect on the part of the accused is contrary to the statutory duties of an attorney as provided in ORS 9.460(2) and 9.460(4), and in conflict with ORS 9.480 (3), which provides the grounds for disbarment, suspension, or reprimand. This resume of a short six-months period of the accused's failure to comply with the court's requests is only part of his total disregard of the law pertaining to the probate of estates and the diligence due on the part of an attorney while acting either as an attorney or as an administrator of an estate. *In re Smith,* 171 Or 151, 134 P2d 956 (1943), at pages 159-60 states, "The obligation of a lawyer to his client, the courts, and the public is no ordinary one, but demands honor the most punctilious in the discharge of all his professional duties * * *." The total failure to comply with his professional duties in respect to the probate of these estates is apparent from a complete review of all of the evidence, including the two probate files of the estates of Marion and Robert Beach which were received in evidence before the trial committee. This action constitutes a violation of Rule 27 of the Rules of Professional Conduct of the Oregon State Bar in

force during the period of probate. ORS 116.170, in effect prior to July 1, 1970, provided:

"In all cases where a person dies while engaged in any trade or business, [other than a partnership] * * * the court having jurisdiction of the administration of the estate of such decedent may, in its discretion, authorize the * * * administrator of the estate to continue and carry on such trade or business for a period not to exceed 12 months after the death of the decedent. The court shall require such * * * administrator to file such additional undertaking, conditioned upon his faithfully carrying out his trust and all orders of the court, * * *."

ORS 116.175 provided:

"In the conduct of a trade or business, the * * * administrator shall keep full and accurate account of all receipts and expenditures, and also of all accounts payable and receivable, and shall make monthly reports to the court * * *."

■ In the instant case, the accused failed to petition the court for such authority, failed to post additional undertaking, continued the operations in excess of twelve months, failed to keep full and accurate account of receipts and expenditures, and completely failed to make monthly reports thereof to the court. In all, the accused's actions as attorney and administrator in these estates are a serious breach of his fiduciary relationship and the duties implied upon him by law.

■ The Bar further charges the accused with unethical conduct in borrowing $25,000 from the sole heir of the estates, Garnet, between August and December, 1963. We have previously reviewed most of the pertinent evidence in regard to this charge. This charge is similar to one discussed in the recent decision of this court in *In re George C. Staples,* 259

Or 406, 410, 486 P2d 1281 (1971). The accused did testify that he advised Garnet to consult with other counsel before lending him the money, but he further stated he did not know if she consulted with any of them. He knew that she was required to place valuable securities with the bank as security for this loan, and he failed to give her any instrument of security or a note evidencing his debt to her. The Garnet notes to the bank were not paid. He agreed to and did pay the interest on the Garnet notes to the bank. However, he acknowledged that two of the payments, a total of $1,865.56, were made from assets of the estate, yet there is no showing in the accounting made to the court that such sums were paid for his benefit. An attorney borrowing money from a client not engaged or knowledgable in the ways of b u s i n e s s should insist upon such a client being represented by independent counsel. In the instant case, Garnet was required to employ an attorney to bring action against the accused in order to effect settlement of her claim. There is no reason for us to repeat our reasoning, which is fully stated in *Staples.*

In this case, the evidence reveals that the client, Garnet, did suffer a loss because of the conduct of the accused. The wrongful conduct is further enhanced by the attorney-administrator taking from the client, Garnet, an assignment of all of her interests in the estates of her parents.

The remaining charges against the accused arise out of the probating of the estates and pertain to the sale of certain property in the estates and the handling of funds received from such sales. The accused admits that some $20,000 of funds received by him belonging to the estate did not go through the estate banking accounts, but were deposited to his account or used by

him in defraying expenses that he advanced on behalf of the estate. The exhibits and accountings filed by the accused are in such an unorganized and disarranged condition that we cannot find by a preponderance of the evidence whether the funds were or were not used or diverted by the accused. There is evidence to indicate that the accused did not personally gain from these transactions. However, the charges and the inability to completely refute the same by accurate records is an indication of the disrespect and suspect that an attorney might find himself in, all to the detriment of other members of the profession, and it is not to be encouraged.

The Board of Governors recommended that Neil Brown be suspended by the Supreme Court from the practice of law in the State of Oregon for a period of two years. We agree that this is the most appropriate discipline.

The accused is suspended from the practice of law for a period of two years and thereafter until he has made application for reinstatement and until he shall affirmatively show that he is in all respects again able and qualified to resume his position as a member of the Bar of this state and that his resumption of the practice of law will not be detrimental to the Bar or to the public interest.

The Oregon State Bar is also awarded judgment against the accused for its costs and disbursements incurred in the disciplinary proceeding in accordance with ORS 9.540(2), (3).

**ON PETITION FOR REHEARING**

PER CURIAM.

In our opinion, 262 Or 171, 493 P2d 1376 (1972), we agreed with the Board of Governors of the Oregon State Bar and suspended the accused from the practice of law for a period of two years. The accused petitions this court for rehearing, contending that we "erred in this decision by imposing an extremely severe form of discipline," and that it was "not warranted by the facts." Three of the assignments warrant further expression by this court. The opinion stated:

"* * * In a deposition of Garnet taken on July 2, 1968, and received as an exhibit in the proceedings before the trial committee, she testified that she tried to get the accused to close the estates as early as the spring of 1962 and she could never find out why they were not closed * * *."

The petition is correct in stating that the deposition, as an exhibit, was rejected by the trial committee. The statement "that she tried to get the accused to close the estates" could well have been omitted

from the opinion. The record does disclose that at the time of the hearing, March 12, 1970, the estates of Robert G. Beach and Marion J. Beach were not closed. Letters of administration were issued to the accused on January 9, 1958.

The record also discloses that Richard Bryson, attorney at law, was called as a witness and testified:

> "She [Garnet] came to me to consult about the estates of her parents and brothers. The Beach estates. There were four of them. She expressed some dissatisfaction with the way they had been handled and the length of time it had taken, and asked me to look into them and advise her."

> * * * * *

> "Q. (By Mr. Joseph) Did Mrs. [sic] Beach [Garnet] express to you any concern over the estates?
>
> "A. Yes, she—she expressed concern over the estates, particularly with reference to the length of time they had taken.
>
> "Q. Did she express concern about any money being missing?
>
> "A. She expressed concern at the lack of accountings.
>
> "Q. Did she indicate to you that she had attempted to get information from Mr. Brown?
>
> "A. Yes, she said that she had been unable to get an accounting from Mr. Brown * * *."

No objection was taken to this portion of the testimony. While this testimony relates to a time much later than the "spring of 1962," it does indicate that Garnet tried to get the accused to close the estates.

Our opinion also stated that "the evidence reveals that the client, Garnet, did suffer a loss because of the conduct of the accused." Petitioner contends that

this finding is incorrect and "inconsistent with all of the evidence in the case." We also stated:

"* * * The accused admits that some $20,000 of funds received by him belonging to the estate did not go through the estate banking accounts, but were deposited to his account or used by him in defraying expenses that he advanced on behalf of the estate. The exhibits and accountings filed by the accused are in such an unorganized and disarranged condition that we cannot find by a preponderance of the evidence whether the funds were or were not used or diverted by the accused. There is evidence to indicate that the accused did not personally gain from these transactions * * *."

We have again reviewed the meager accountings filed with the court by the accused, acting as attorney and administrator of the four estates, together with the exhibits received by the trial committee and the transcript of testimony at the time of the trial. We are again impressed with the reason why this accused finds himself in such an embarrassing position. He attempted to continue the logging and sawmill operations of the deceased Robert and Marion Beach and to deal personally with the partnership and corporate ventures rather than as administrator of the assets of these estates, all without approval of the court.

In an effort to unravel the accused's transaction as administrator, the certified public accountant firm of Lee, Coleman, Allen & Bedint was employed to secure an analysis of the financial transactions involving the estates of Robert G. Beach and Marion J. Beach. It was stipulated that the "analysis" be received in evidence as a joint exhibit. A summary from that accounting firm attached to the exhibit reads in part as follows:

"As you know, there was certain property listed

in the two estates which took the form of corporate stock, or partnership interests. We were not furnished any financial information on these companies, and therefore, we are not able to state how these interests were disposed of. Obviously, some of the transactions contained in our analysis represent the sales of certain properties which were owned by these corporations and partnerships. However, we are unable to say whether this represents all of the property of these organizations, or only a part thereof."

From our review of the record we are met with the same problem expressed by the firm of accountants. The accused did not keep adequate records. A comparison of the inventory and appraisement filed in the estates with records of personal property disposed of shows that the records, as far as they disclose the estate assets and transactions, are not complete. The testimony discloses that the accused, without approval of the court, attempted to salvage the assets of a business previously operated by the deceaseds in northern California and that he used funds from the Oregon estates in this effort. This, by his own language, is apparently where he met his downfall. Mr. Brown gave the following testimony at the hearing before the trial committee:

"Q. Now, was the manner in which you handled this estate different or abnormal or unusual from the manner in which you approached other legal matters, including other estates?

"A. Well, after a time I took an intense interest in trying to solve or salvage or do something about that—that horrible loss in California, I'm sure that it must have exceeded three hundred and fifty thousand dollars, but it didn't work."

The record is replete with testimony describing the attempt to salvage assets from the California oper-

ation. The record also discloses that the two principal estates were kept open for a period of twelve years and for a number of years the administrator bond was renewed at an annual cost of approximately $550. Subsequently, on petition, the amount of the bond was reduced until such time that he began to dispose of real property of the estates. We can see no reason for keeping these estates open for a period of twelve years. Undoubtedly the estates lost assets by the extension of the time for probate. The record also discloses interest and penalty charges on estate taxes.

One of the other charges against the accused was in connection with his borrowing $25,000 from Garnet, the sole heir of the estates. She, in turn, had borrowed this money from the bank on her personal notes, which were not paid. The accused was to pay the interest. However, he acknowledged that two of the interest payments, totaling $1,865.56, were made from assets of the estate.

From reviewing all of the evidence, we must conclude that Garnet, the sole heir of the estates, did suffer loss because of the conduct of the accused as administrator and attorney of the four estates.

Petitioner criticizes our stating that the assignment of the client-heir's interest to the accused was wrongful.

The assignment was in settlement of the heir's claims against petitioner and petitioner's claims against the client. The settlement document states that the heir's claim is settled for $20,000. The settlement was accomplished in part by paying petitioner's obligation to the heir with estate funds. This, without further explanation, is obviously wrongful. The petitioner denies this occurred but had no explanation

except that his attorney could explain. Petitioner's attorney was called but he did not explain how it was proper to use moneys representing payments on a note which was an asset of the estate to pay petitioner's obligation to the heir. This mode of settlement was apparently agreed to by the heir's then attorney; however, he was not called to make any explanation.

On the basis of the evidence in the record, we adhere to our characterization of the assignment as "wrongful conduct," having in mind that this arrangement and the assignments of the sole heir's interest in the estates were not approved by the probate court.

The petition for rehearing is denied.