Argued April 1, reversed October 21, petition for rehearing
denied December 23, 1953

# STATE OF OREGON *v.* BUCK

262 P. 2d 495

88

*Ralph E. Moody,* of Salem, argued the cause for appellant. On the brief were Moody & Lamkin, Henry M. Hanzen and Douglas L. Hay, all of Salem.

*Charles E. Raymond* and *James J. Kennedy,* Deputy District Attorneys of Multnomah County, of Portland, argued the cause for respondent. With Charles E. Raymond on the brief were John B. McCourt, District Attorney, and C. W. Robison, Deputy District Attorney.

LATOURETTE, C. J.

Appeal by Dr. George H. Buck, a duly licensed physician and surgeon of the state of Oregon, from a judgment of conviction and sentence predicated on the alleged violation of § 23-408, OCLA, known as the Criminal Abortion Act, which is as follows:

> "If any person shall administer to any woman pregnant with a child any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall be necessary to preserve the life of such mother, such person shall, in case the death of such child or mother be thereby produced, be deemed guilty of manslaughter."

The indictment, inter alia, charges that on December 11, 1950, Dr. Buck, by employing certain instruments, destroyed the unborn child of a certain woman, it not being necessary to preserve the life of the woman.

The medical code, in effect at the time in question, after providing for a board of medical examiners, the licensing of physicians and surgeons, and other pro-

visions not necessary for this opinion, provided by § 54-931, OCLA, inter alia, as follows:

"The board may refuse to grant a license to any applicant who desires to practice medicine and surgery in this state or may suspend or revoke such licenses for any of the following reasons:

"(a) Unprofessional or dishonorable conduct;

"(b) The procuring or aiding or abetting in procuring an abortion unless such is done for the relief of a woman whose health appears in peril because of her pregnant condition after due consultation with another duly licensed medical physician and surgeon;

"* * * * *

"(i) Conviction of any offense for which the punishment may be incarceration in a state penitentiary or in a federal prison; a copy of the record of conviction, certified to by the clerk of the court entering the conviction, shall be conclusive evidence;

"* * * * * *"

Among the definitions found in § 54-901, OCLA, are the following:

"* * * * *

"'Unprofessional or dishonorable conduct' shall mean such conduct as would not be indulged in by an ethical physician and surgeon, under all the circumstances, taking into consideration the good of the patient, and the public, the time and place.

"'Abortion' shall mean the expulsion of the foetus at a period of uterogestation so early that it has not acquired the power of sustaining an independent life; provided it shall be conclusively presumed for the purpose of this statute that the foetus has not acquired such power earlier than one hundred fifty (150) days after gestation, and a disputable presumption of lack of such power shall arise if the expulsion take place earlier than two hundred forty (240) days after gestation."

The main question involved in this appeal is what effect, if any, the Medical Practice Act contained in chapter 9, title 54 (§ 54-901—54-945, OCLA, as amended) has on the Criminal Abortion Act. And in this connection it may be noted that the outcome of this case not only affects Dr. Buck, whose license to practice medicine has heretofore been revoked on a matter wholly unrelated to the facts in this case, *In re Buck*, 200 Or 488, 258 P2d 124, but also the entire medical profession.

■ It is a familiar rule that a court, in construing a statute, must ascertain the intent and purpose of the legislation from the language used. The rule is well stated in *Swift & Co. and Armour & Co. v. Peterson*, 192 Or 97, 108, 233 P2d 216, as follows:

> "The cardinal rule for the construction of a statute is to ascertain from the language thereof the intent of the lawmakers as to what purpose was to be served, or what object was designed to be attained. Leonard v. Ekwall, 124 Or. 351, 359, 264 P. 463; Fox v. Galloway, 174 Or. 339, 346, 148 P. 2d 922. We accomplish this with such aid as may be found in the rules of interpretations and legitimate extrinsic sources, always keeping in mind that the legislative intent to enact a valid and constitutional law will be assumed. Fullerton v. Lamm, supra, at page 670. When the legislative intent has been ascertained, it should be given effect, even though, in doing so, the literal meaning of the words used is not followed. Allen v. Multnomah County, 179 Or. 548, 554, 173 P. 2d 475; Wood v. State, 133 Tex. 110, 126 S. W. 2d 4, 121 A. L. R. 931, 935. In arriving at the legislative intention, it is proper for the court to take into consideration the policy and purposes of the Act, and to consider in that connection whether or not such a policy and purposes will be attained by a literal interpretation of the language used. Ban-

field v. Schulderman, 137 Or. 167, 178, 296 P. 1066, 298 P. 905, 89 A. L. R. 504; Allen v. Multnomah County, supra, at 554. It is the express intent of the legislature which we seek, and to do this we must look to the entire statute. * * *."

█ It is well recognized that when the language of an act is unambiguous the intent of the legislature must be gained from the language used.

Giving consideration to the Medical Practice Act alone it is obvious that the same clearly and pointedly authorizes a doctor to perform an abortion as therein defined, if the same is done for the relief of a woman whose health appears in peril because of her pregnant condition after due consultation with another duly licensed medical physician and surgeon.

█ Since the Criminal Abortion Act and the Medical Practice Act conflict, it is our province to determine the relationship between the two, and, in so doing, we must construe the same together. It is true that the Medical Practice Act makes no express reference to the Criminal Abortion Act, but that is unimportant if there are necessary implications relating to it.

█ We recognize that repeals, amendments or modifications of previous statutes by implication are not favored, nor are they frowned upon in a proper case. If the legislature clearly intended by the enactment of the Medical Practice Act to alter or change the Criminal Abortion Act under given circumstances, such intention must be given full force and effect.

█ It is generally conceded that statutes in pari materia are to be construed together. There is another rule of equal importance, and that is, although statutes are not strictly in pari materia, yet, if they relate to the same matter, persons or things, or the same class

of persons or things, or are closely allied to the same subject or object, they may be construed together.

In 50 Am Jur 347, Statutes, § 350, we read:

"Although there may be statutory provisions which, in a sense, relate to the same matter and yet are not in pari materia, the general rule is that statutes or statutory provisions which relate to the same person or thing, or to the same class of persons or things, or to the same or a closely allied subject or object, may be regarded as in pari materia. * * * ''

In Black, Interpretation of Laws, 2d ed, p 340, § 104, we find the following:

"It is also held that legislation which is of a similar nature to the statute under consideration, although not precisely in pari materia, is within the reason of the rule, and may be referred to for the same purpose * * *.''

In Crawford, Statutory Construction, we read:

"Just as the different words, phrases and provisions of a statute should not be isolated and given an abstract meaning, so the statute itself in its entirety should not be interpreted solely by reference to its own terms, but rather by reference to the other laws of the state, and particularly to those pertaining to the same subject. Every statute should be regarded as a part of the whole body or system of law. Consequently, in construing a statute, the constitution, the common law, and other statutes, particularly those in *pari materi* and those expressly referred to, should be examined, in the effort to ascertain the intention of the legislature. * * * p 420, § 227.

"When it is necessary to resort to the process of construction, the court may properly refer to certain other statutes in its effort to determine the meaning of the language used by the legislature, epecially where such statutes are pre-existing or contemporaneous. While this rule is particularly

applicable to statutes in pari materia, the court is
not limited to statutes of that character. Certain
statutes which are not strictly in pari materia
may also be given consideration, such as statutes
on cognate subjects, since they are within the rea-
son of the rule which allows reference to statutes
in pari materia. * * *'' p 428, § 229.

■ In construing statutes to determine the intent
of the legislature, it makes no difference whether the
court is construing a civil statute in relation to a
criminal statute, or vice versa; the ultimate object
is to ascertain the intention of the legislature in en-
acting such legislation. In 82 CJS 815, Statutes,
§ 366, we read:

"* * * Other related legislation may be con-
sidered in construing statutes dealing with * * *
crimes, * * *; and in this respect, similar ex-
pressions in civil and criminal statutes dealing
with the same general subject should be given a
uniform construction, and resort to the civil statutes
as well as to the penal code will be had to give
meaning to language appearing in the criminal
statutes.''

In *State v. Ebbs,* 89 Mo App 95, 98, the court said:

"* * * Though section 3867 is found in chap-
ter 47 of the statute relating to crimes and punish-
ments, while section 7537 is embraced in chapter
138 in relation to the assessment and collection
of the revenue, they both touch the same subject,
and therefore should be treated and considered in
accordance with the rule just referred to.''

In *United States v. Hutcheson,* 312 US 219, 85
L ed 788, 61 Sup Ct 463, the Supreme Court, in con-
struing the Sherman Act (criminal) and the Clayton
and Norris-La Guardia Acts (civil) said:

"In order to determine whether an indictment
charges an offense against the United States,

designation by the pleader of the statute under which he purported to lay the charge is immaterial. He may have conceived the charge under one statute which would not sustain the indictment, but it may nevertheless come within the terms of another statute. See Williams v. United States, 168 U. S. 382, 42 L. ed. 509, 18 S. Ct. 92. On the other hand, an indictment may validly satisfy the statute under which the pleader proceeded, but other statutes not referred to by him may draw the sting of criminality from the allegations. Here we must consider not merely the Sherman Law but the related enactments which entered into the decision of the district court."

A consideration of the opinion of this court, written by Mr. Justice Rossman, in *Multnomah County Fair Association v. Langley,* 140 Or 172, 13 P2d 354, in connection with the Racing Commission Act adopted in 1933, §§ 91-901 to 91-913, OCLA, will disclose a situation on all fours with that in the case at bar.

In the Langley case, one of the questions involved was whether pari mutuel betting upon horse races constituted a nuisance in violation of § 14-722, Oregon Code 1930, now § 23-927, OCLA. In passing, we note that this nuisance statute was first adopted in 1864, and has since been a criminal law of this state. The court, in the Langley case, held that such pari mutuel betting constituted a violation of § 14-722, Oregon Code 1930. Following the decision in that case, the legislature, in 1933, adopted the Racing Commission Act, providing for the licensing of pari mutuel betting upon animal races, and since that time licensees have been permitted to lawfully carry on pari mutuel betting that prior to the adoption of the act would have been unlawful. It is noted that in the racing act no mention whatever is made of the nuisance

statute. Here, clearly, the licensing act had a direct effect upon the nuisance statute and modified it to the extent provided in the later Racing Commission Act, just as the Medical Practice Act, also a licensing act which permits duly licensed physicians and surgeons to perform certain abortions that prior to its adoption would have constituted manslaughter, modifies the Criminal Abortion Act. See also *Reser v. Umatilla County*, 48 Or 326, 329, 86 P 595; *Portland v. Portland Ry. Light & Power Co.*, 80 Or 271, 306, 156 P 1058.

In *City of Portland v. Duntley*, 185 Or 365, 390, 203 P2d 640, we said:

"It is our holding, based upon an analysis of the Oregon Racing Act, the applicable principles of statutory construction, and the pertinent decisions, that the only effect of that Act, so far as the present question is concerned, was to except regulated pari mutuel wagering at a licensed race track from the operation of the Oregon Nuisance Statute, leaving that statute otherwise in full force and effect. * * *."

Before leaving the pari mutuel statute we call attention to § 91-911, OCLA, where it is provided that all nonprofit fair associations, such as the State Fair, County Fairs, and Pendleton Round-up, are not required to have licenses to conduct such races but that they shall be entitled to withhold 10 per cent of the gross receipts of mutuel wagering. We do not believe that anyone would deign to argue that such associations would be amenable to the Nuisance Act.

To determine the intent of the legislature in enacting the Medical Practice Act, we shall trace the same from its inception. Subsequent to the passage of the Criminal Abortion Act, the legislature, by the

Laws of 1889, page 144, adopted an act entitled: "An Act to Regulate the Practice of Medicine and Surgery in the State of Oregon." This statute created a "board of examiners for the State of Oregon," and provided for issuance by it to applicants, entitled under the law thereto, of licenses to practice medicine and surgery within the state. Provision was made for revocation of licenses, after hearing, for "improfessional [sic] or dishonorable conduct," but the act contained no detailed statement of what might be deemed such conduct.

The legislature, by the Laws of Oregon, 1895, p 61, enacted a new and complete law embodying the Medical Practice Act. The act provided for the appointment of a Board of Medical Examiners, for the issuance of licenses to practice medicine and surgery, and invested the board with the following power: "and such board may refuse or revoke a license for unprofessional or dishonorable conduct, subject, however, to the right of such applicant to appeal," as in the act provided. Section 4 of the act defined "unprofessional" or "dishonorable conduct" as follows:

"The words 'unprofessional' or 'dishonorable conduct,' as used in section three (3) of this act, are hereby declared to mean: First, the procuring or aiding or abetting in procuring a criminal abortion; * * *"

■ Inasmuch as the only statute of the state that defined and prohibited "a criminal abortion" was what is now § 23-408, OCLA, it manifestly was the intent of the legislature by such reference to abortion, to refer to and incorporate into the 1895 Act, so far as applicable, the provisions of the Criminal Abortion

Act. *Board of Medical Examiners v. Eisen,* 61 Or 492, 123 P 52.

The legislatures of 1913, 1915, 1927 and 1935 amended in some respects the Medical Practice Act but retained the provision authorizing the board to revoke licenses for unprofessional or dishonorable conduct in "the procuring or aiding or abetting in procuring a criminal abortion."

It is obvious from the foregoing enactments that the legislature intended, by the use of the term "criminal abortion" in the Medical Practice Act, to hold physicians and surgeons responsible under the Criminal Abortion Act, as well as to subject them to a revocation of license for a violation of that statute. Under then existing law, physicians and surgeons, as well as all other persons, were prohibited from performing any abortion whatsoever, unless such abortion was necessary "to preserve the life" of the mother.

By chapter 277, Oregon Laws 1937, the legislature amended the Medical Practice Act in a very material respect by defining the words "unprofessional" and "dishonorable conduct" as

"* * * the procuring or aiding or abetting in procuring an abortion unless such is done for the relief of a woman whose health appears in peril after due consultation with another licensed medical physician and surgeon."

It will be noticed that in the amending act the word "criminal", which had been employed in the Medical Practice Act for a period of over 40 years, was removed from the language previously used and the amendment above noted added; however, "abortion" was not defined. To remedy this situation and to make certain what kind of abortion a medical doctor

could perform, the next legislature, by chapter 153, § 3, amended the Medical Practice Act in the respect that "abortion" was defined to mean:

"* * * the expulsion of the foetus at a period of uterogestation so early that it has not acquired the power of sustaining an independent life; provided it shall be conclusively presumed for the purpose of this statute that the foetus has not acquired such power earlier than one hundred fifty (150) days after gestation, and a disputable presumption of lack of such power shall arise if the expulsion take place earlier than two hundred forty (240) days after gestation."

We glean from the foregoing that at the time the alleged crime was committed, the medical board had the authority to revoke the license of a doctor if he procured or aided or abetted in the procuring of an abortion, being one where the foetus was expelled so early, as defined by the act, that it had not acquired the power of sustaining an independent life, unless it was done for the relief of a woman whose health appeared to be in peril, after collaboration with another licensed medical physician and surgeon. Conversely, the board would have no authority to revoke the doctor's license if he performed the abortion mentioned where it appeared to him that the woman's health was imperiled after due consultation with another physician.

It necessarily follows, as night the day, that if the board had no right to revoke the doctor's license if he performed the abortion under the circumstances mentioned, the doing and performing of such an abortion would be legal, and not unlawful. In other words, if one is told that he will be chastised for doing a certain thing unless he does it in a certain way, it is

equivalent to telling him that if he does it in the prescribed way he will not be punished.

It would be parodoxical, indeed, if the state were permitted to prosecute a doctor for a violation of the Criminal Abortion Act when, under the Medical Practice Act, he was permitted to do the very thing he was prosecuted for. And, further, it would be absurd and an anomaly if the board were authorized to cancel a doctor's license upon conviction under the Criminal Abortion Act when it would not be permitted to so do where an abortion was legally conducted under the Medical Practice Act.

That it was the intention of the legislature to place medical physicians and surgeons in a class by themselves, as far as abortions, as defined by the Medical Practice Act, are concerned, is further illustrated in the legislation affecting naturopaths, chapter 451, Laws of 1927, § 54-531, OCLA, wherein their licenses could be revoked for performing criminal abortions. It is interesting to note in this connection that although chiropractors, by § 54-331, OCLA, could have their licenses revoked for the conviction of a crime involving moral turpitude, no mention was made of abortions until the legislature of 1953 enacted chapter 556, where it was written that a chiropractor could have his license revoked for

"* * * * *

"(g) The procuring or aiding or abetting in procuring an abortion, and for the purpose of this Act an abortion shall be deemed to mean the removal from the womb of a woman the product of conception at any time prior to delivery of the child; provided, however, nothing in this Act shall be construed to authorize any licentiate under title 54, chapter 3, OCLA, to perform an abortion;

"* * * * *"

It is patent that under the above legislation chiropractors or naturopaths stand on the same footing as ordinary persons, so far as the Criminal Abortion Act is concerned and are amenable thereto.

That the legislature intended to legalize abortions as defined in the Medical Practice Act is further exemplified by chapter 265, Oregon Laws 1951. By that act the law affecting the practice of abortions by medical doctors was tightened and strengthened. By that act, when a doctor performs an abortion he must consult with another duly licensed medical physician and surgeon "who is not an associate or relative of the physician or surgeon and who agrees that an abortion is necessary." The law further provides:

"* * * The record of this consultation shall be in writing and shall be maintained in the hospital where the consultation occurred or in the offices of all physicians and surgeons involved for a period of at least three years after the date of such abortion."

As the law now stands, if criminal jurisdiction were permitted to attach, not only would the doctor performing the abortion, but also his medical collaborator, be criminally liable. In such a case the hospital record made by the doctor under accusation could be used against him in furtherance of the criminal prosecution.

In passing, we call attention to the legislative enactments, ch 128, Laws of Oregon 1945, and ch 183, Laws of Oregon 1953, applying to osteopathic physicians which parallel the laws pertaining to abortions in the Medical Practice Act. Thus, osteopathic and medical doctors, so far as abortions are concerned, are placed in a category distinct from that of chiropractors and naturopaths.

██ Since we have held that a medical doctor has the legal right to perform an abortion, as defined in the Medical Practice Act, provided he acts for the relief of a woman whose health appears in peril because of her pregnant condition, after consultation with another medical doctor, the question is posed whether or not such relief of a woman whose health appears in peril because of her pregnant condition is an integral part of the crime charged against him or a matter of defense. It is conceded by the state, and the law in Oregon is well established, that if such provision is a material part of the description of the offense and a necessary ingredient thereof, the same must be negatived in the indictment, but, if not, it is a mere matter of excuse or defense and need not be negatived in the indictment. *State v. Tamler & Polly,* 19 Or 528, 25 P 71; *State v. Schriber,* 185 Or 615, 629, 205 P2d 149.

██ It is likewise conceded, and it is the law, that in an indictment under the Criminal Abortion Act, the necessity to preserve the life of the mother must be negatived and proved. *State v. Glass,* 5 Or 73; *State v. Clements,* 15 Or 237, 14 P 410; *State v. Ausplund,* 86 Or 121, 167 P 1019; Annotation, 153 ALR 1266.

In the case at bar, it is admitted that the defendant is a duly licensed physician and surgeon and that the abortion in question was performed within 150 days after gestation. Since the indictment did not negative that the abortion was performed for the relief of the woman in question, whose health appeared imperiled because of her pregnant condition, would this be fatal to the state's case?

██ It is axiomatic that if accused can admit the truth of every allegation in the indictment against him

and yet be innocent of any crime, the indictment is insufficient as to him and will not support a conviction. In the instant case, if the defendant performed the abortion upon the woman in question, whose health appeared imperiled because of her pregnant condition, after due consultation with another duly licensed physician and surgeon, he was guilty of no crime.

It seems logical that if it is necessary to charge in an indictment in an ordinary criminal abortion case that the abortion performed was not necessary to preserve the life of the mother, that being an integral part of the crime, by analogy, in a prosecution against a duly licensed physician and surgeon for an abortion, as defined by the Medical Practice Act, it would likewise be necessary to charge that the abortion was not performed for the relief of a woman whose health appeared in peril because of her pregnant condition, since that too would be an integral part of the crime as against such a licensed physician and surgeon.

■ Bearing in mind that related statutes must be construed together as if they were one law, we must construe the Criminal Abortion Act and the Medical Practice Act together as if they were one act where a licensed physician and surgeon is charged with committing an unlawful abortion as defined under the Medical Practice Act. *Erickson v. Erickson,* 167 Or 1, 15, 115 P2d 172. When the matter is approached from this angle, it can readily be seen that the relief of a woman whose health appears in peril because of her pregnant condition attains the same importance as the necessity "to preserve the life of such mother." We do not apprehend that the district attorney would argue against the necessity of negativing in the indictment that the abortion was performed for "the relief of a woman whose health appears in peril be-

cause of her pregnant condition'' if the Criminal Abortion Act itself contains such language.

 A medical doctor who, in performing an abortion as defined by the Medical Practice Act, having complied with all of its terms and conditions, is absolved of criminal liability; on the other hand, if he fails to meet all the requirements specified in the abortion sections of the Medical Practice Act, he would be liable under the Criminal Abortion Act and subjected to its penalties. The construction we have placed on this legislation protects ethical medical practictioners in the pursuit of their profession and in no wise places a protective cloak over the unethical medical practitioner.

REVERSED.

ROSSMAN, J., specially concurring.

This appeal calls for a construction of § 23-408, OCLA, (Criminal Abortion Act) and §§ 54-901 to and including 54-945, OCLA, as amended, (Medical Practice Act). The question before us is, should the two acts be construed together or should we say that the second is foreign to the first and that it must be ignored in the construction of the first.

The following three possible interpretations present themselves: (1) the two acts should be read together and they should be held to mean that a licensed physician may relieve a woman of her unborn child if he finds that the woman's health is imperiled by her pregnant condition [the majority adopt that interpretation of the legislation]; (2) the two acts should be read together, but they should be deemed to mean that the Medical Practice Act repeals, so far as physicians are concerned, the Criminal Abortion Act; (3) the Medical Practice Act has no bearing

whatever upon the Criminal Abortion Act and must be ignored in applying the latter.

If the third alternative were embraced by the court, the result would be that a physician would be guilty of manslaughter under § 23-408, OCLA, although he could not be ejected from the medical profession in the following set of circumstances: (1) a pregnant woman called upon him with a complaint concerning her health; (2) he found, in good faith, that her health was imperiled by her pregnant condition and that an abortion was necessary; (3) he consulted with other licensed medical physicians (in no way related to or associated with him) and they concurred in a finding that the woman's imperiled health demanded an abortion; (4) the physicians placed their finding in writing, including a statement that an abortion was necessary to save the woman's imperiled health; and (5) the physicians filed their signed writing in the office specified by Oregon Laws 1951, Ch 265, § 3. May I add that in such an instance the writing which the physicians signed, in reliance upon Oregon Laws 1951, Ch 265, § 3, would turn against them and would be an admissible item of evidence leading to their conviction under § 23-408, OCLA. Obviously, under such circumstances, no physician would take the course offered by the Medical Practice Act. Thereby legislation, which had its genesis in the 1937 legislative session, and which, through amendments since that year has taken its present form, would become a trap and a snare for the unwary. It would be shunned by all except the unsuspecting, and the result which it was intended to yield would be thwarted.

The majority opinion, which adopts the first of the three mentioned choices, is criticized in the minority opinion of this court. It appears to me that had the

third choice been embraced by the court, it would be subject to criticism of manifest merit, for to hold that an ethical physician who wishes to comply with our laws may be convicted of a felony, after he has faithfully followed an enactment of the legislature, would assign to legislation a meaning so palpably absurd and truculent that all would recoil from it and declare that the legislature could not have intended to bring about such a result.

Beginning with the session of 1937, the legislature began to insert provisions in the Medical Practice Act delineating and regulating a physician's right to relieve a woman of her unborn child. In that year, through Oregon Laws 1937, Ch 277, the right of a physician to relieve a pregnant woman was clarified by making the Medical Practice Act read:

> " * * * unless such is done for the relief of a woman whose health appears in peril after due consultation with another licensed medical physician and surgeon."

In 1939 the act again had the attention of the legislature, but I shall pass on to Oregon Laws 1951, Ch 265, § 3, which amended the provision just quoted so as to make it read:

> " * * * unless such is done for the relief of a woman whose health appears in peril because of her pregnant condition after due consultation with another duly licensed medical physician and surgeon who is not an associate or relative of the physician or surgeon and who agrees that an abortion is necessary. The record of this consultation shall be in writing and shall be maintained in the hospital where the consultation occurred or in the offices of all physicians and surgeons involved for a period of at least three years after the date of such abortion."

It seems clear that the legislature believed that its enactments, beginning with 1937 and culminating in the provision just quoted, stated with clarity the conditions under which a physician could relieve a woman of her unborn child. Likewise, it appears plain that the legislature reasoned that those laws would render more certain the conviction of the guilty and the protection of ethical physicians. The legislature, obviously, thought that a physician, who, in good faith, contemplated the performance of the operation, would willingly consult with another and that the two would not object to placing their findings in writing and filing the latter in the appropriate office. Only the unscrupulous would object to that course, so the legislature manifestly reasoned. Hence, the legislation, as perfected by the 1951 amendment, which the minority deem as virtually vacuous, was designed to yield a desirable result. It was intended to afford protection to ethical practitioners and render more certain the conviction of the unscrupulous. Under it the prosecution of abortionists would no longer be stymied by the unwillingness of the woman to cooperate.

Oregon Laws 1945, Ch 128, which forms a part of the enactments pertaining to osteopathic physicians, is a counterpart of the 1939 act, with the exception that it employs the term "osteopathic" in lieu of "medical" physician. Oregon Laws 1953, Ch 183, § 2, likewise pertaining to osteopaths, is substantially a duplicate of the 1951 statute above quoted. The legislature has not subjected other elements of the medical profession to the legislation just reviewed. As recently as the 1953 session, the legislature was concerned with chiropractors (Oregon Laws 1953, Ch 556) and naturopaths (Oregon Laws 1953, Ch 555), but did not recognize in either of those branches of the

profession a right to relieve a pregnant woman of her child for the preservation of her health.

In view of the foregoing many enactments which recite with clarity the powers of physicians, osteopaths, chiropractors and naturopaths, and, going on, set forth the standards to which they must conform in dealing with pregnancy, it would be unreasonable to believe that this extensive legislation was intended to accomplish nothing except to save from revocation the licenses of physicians and osteopaths who rendered the service described in those legislative enactments. Surely, the legislature would not have gone to all of that trouble to do nothing more than to save a license from revocation, especially not if it deemed that the licensee's service to his patient was felonious. The extensive enactments which our legislative assembly has been perfecting since 1937 would not really save an osteopathic or medical physician's license from revocation even if he complied meticulously with, respectively, Oregon Laws 1953, Ch 183, § 2, and Oregon Laws 1951, Ch 265, because after he had been convicted under the Criminal Abortion Act, the Board of Medical Examiners would be compelled to revoke his license on account of his conviction of the crime: § 54-931, subd (i), OCLA, and Oregon Laws 1953, Ch 183, § 2. Thus, legislation represented by a half dozen or so acts, and intended to combat the unscrupulous, would be even less productive than the mountain in Aesop's fable which labored but brought forth only a mouse. Unless the above cited enactments dealing with physicians, osteopaths, chiropractors and naturopaths were intended to set forth their powers and the standards to which they must conform, they are completely useless and the legislature frittered away its time when it adopted them.

Oregon Laws 1953, Ch 540, which extends the provisions of our nuisance laws (§§ 9-407 through 9-411, OCLA) to premises in which abortions are performed, includes the following:

> "* * * unless such is done for the relief of a woman whose health appears in peril because of her pregnant condition after due consultation with a duly licensed medical or osteopathic physician and surgeon under the conditions and restrictions prescribed in subsection (2) of section 54-931 or section 54-831, O.C.L.A., * * *."

It will be observed that the quoted words are, for all practical purposes, the same as those in the medical and osteopathic physicians acts. Let us suppose that a building is occupied by a group of physicians, one of whom relieves a patient of her unborn child for the purpose of preserving her imperiled health. Let us also assume that before the physician took that course he consulted, in good faith, other licensed physicians and that they pursued, in similar good faith, the course exacted by the Medical Practice Act, particularly Oregon Laws 1951, Ch 265; that is, let us assume that the physicians placed their diagnosis in writing, signed it and filed it with the hospital authorities. Under those circumstances, if the contentions of the minority are correct, the physician could be convicted under the Criminal Abortion Act and the writing would be material evidence in his case; but, upon the other hand, the owner of the premises would be guilty of nothing. Yet, in the two instances, the legislation would, for all relevant purposes, be the same. In the instance of the physician, the legislation would mean nothing except that his license could not be revoked; in fact, the certificate which he signed, pursuant to the demands of that legislation, would render certain

his conviction. In the instance of the property owner, the legislation would mean that the operation of his premises was lawful, and the document which the physicians signed would be his (the owner's) protection. Thus, the act would be Janus-faced. The face confronting the doctor would declare to him that the act merely saved for him his license, but rendered his conduct felonious. The face toward the owner would announce that he had committed no crime whatever. Surely the legislature did not intend by this enactment to utter out of the two corners of its mouth such bizarre pronouncements.

Let us carry the situation projected by the minority's view one step further. Let us assume that the physician and the property owner are one and the same individual; that is, that the physician is the owner of the building in which his office is located. In that event, the purported criminal in the two cases would be the same person. Likewise, the alleged criminal conduct (the abortion) would be the same, and, finally, the controlling statutory provision applicable to both cases would be couched in the same terms. Yet, in that situation, the defendant, as property owner, would be held not guilty, but, as physician, he would be found guilty. Does not this demonstrate that when the legislature wrote into the Medical Practice Act the provision under scrutiny, it was not concerned merely with the license but with delineating the rules governing the physician's right to relieve a woman of her unborn child.

The minority opinion declares that, since the 1953 amendment to the state's nuisance legislation says that its mention of the manslaughter act (Criminal Abortion Act) shall not be "deemed to modify, alter or amend" that act, therefore this court is precluded

from holding that the 1951 amendment to the Medical
Practice Act and the 1953 amendment to the osteo-
pathic act likewise did not modify or amend the man-
slaughter act. The contention is plainly illogical. In-
dubitably the provision about the manslaughter act
was written into the nuisance act to make it clear that
the standard applicable to all who effect abortions,
except medical men, is that which is employed in the
manslaughter act ["to preserve the life of such
mother"]. If the legislature had not wished to "modify,
alter or amend" the manslaughter act as to medical
men, it surely would not have announced its purpose
in the nuisance act (or in any other type of legislation
such as acts dealing with perjury, usury, highways,
etc.) but in its legislation dealing with medical men,
and, as we have seen, it adopted in 1953 extensive
legislation dealing with them and with the right of
osteopaths, chiropractors and naturopaths to relieve
a woman of her unborn child. It did not say in that
legislation that its enactments should not be deemed
to affect the manslaughter act.

The minority say: "Section 23-408, OCLA, con-
cerning manslaughter by abortion is incorporated with-
out material change in the Oregon Revised Statutes
and appears therein as section 163.060. The Revised
Statutes were adopted *as law*. Oregon Laws 1953,
chapter 3." Indeed they were, but so, also, was all
other legislation which had been adopted in this state
prior to January 12, 1953. See Oregon Laws 1953,
Ch 3. And, accordingly, the extensive legislation which
the assembly had written prior to 1953 defining a
physician's right to effect an abortion was likewise
adopted by Oregon Revised Statutes "as law". In
other words, the Medical Practice Act and the osteo-
pathic act were as much adopted "as law" by Oregon

Laws 1953, Ch 3, as the manslaughter act. Moreover, the 1953 legislation concerning chiropractors, naturopaths, osteopaths and nuisance was adopted after, not before, Oregon Laws 1953, Ch 3. Nothing is gained by indulging in the observations of the minority about our Revised Statutes. But let us not drop the matter at that point. As we see from the contention made by the minority, the Medical Practice Act and the Criminal Abortion Act are now parts of our Revised Statutes and both were adopted simultaneously by Oregon Laws 1953, Ch 3. They were adopted, if the minority are right, as parts of one great omnibus act. Accordingly, they are parts of one act as much as two paragraphs of our Statute of Limitations or the several parts of an appropriation act. Since such are their nature, we do not apply to them the rules of implied repeal, to which the minority opinion gives much attention, but the rule that the several parts of a single act must be read and construed as a whole.

Obviously, the legislature, in creating the Revised Statutes, never intended that consequences such as the minority call to their aid should come from its efforts to give us a better compilation of our laws. I have indulged in the above observations to show the lack of merit in the reasons which brought the minority to their point of view.

The minority find that the Medical Practice Act is administrative in character and, having reached that conclusion, hold that it can have no effect whatever upon the Criminal Abortion Act. I shall not disagree with the minority's characterization of the act, although I believe that it would be better to term it a licensing act. I call attention especially to §§ 54-921 through 54-924, OCLA, as amended.

Licensing acts, whether we deem them administrative in character or otherwise, generally confer power. They authorize the licensee to exercise privileges or engage in activities which he otherwise could not do. Not infrequently they protect him from liabilities or criminal penalties to which he would be subject if he did not possess his license. Let us explore that a little further. A license to practice medicine, like a license to practice law or engage in engineering, is not easily won. Years of schooling, followed by a difficult examination conducted by a state board of examiners must be undergone before the license is issued. Valuable privileges and powers await those who can run the hard course. The long schooling and the hard examination are the means which the state employs for selecting those to whom it will entrust the momentous powers. When the license has finaly been received, the licensee finds himself authorized to do things which the layman cannot do without subjecting himself to damage actions or possibly even to criminal prosecution. I shall mention some examples. It is unlawful for a layman to use or possess narcotic drugs, but a physician can prescribe, administer and dispense morphine, cocaine and other narcotics. A young man who passes the state bar examination, and thereby wins a license from this court to practice law, may thereupon make statements, orally or in writing, to a court without subjecting himself to damage liability or criminal prosecution for defamation. One who meets the tests and gains for himself an apothecary's license may possess and sell substances in which a layman cannot deal. One who gains the right to wear the robes of a cleric becomes invested with the power to perform marriage ceremonies and with exemptions, such as those from taxation and military

service. Anyone, upon a moment's thought, will bring to mind many additional instances showing that the purpose of licensing acts is to confer power and grant exemptions. Hence, we do not stop when we find that an act under review is administrative or licensing in nature; to the contrary, we go on and view it as one whereby the legislature very likely intended to confer upon the licensee powers which the ordinary layman does not possess. This is especially true in the event that other legislation required the licensee to undergo long training and meet severe tests before he won his license. No one would seek a license if, without one, he could do the things which the license authorizes him to do.

The very fact that the authority to relieve a woman of her unborn child, under the circumstances delineated in the 1937 and 1951 enactments, is set forth in a licensing act is surely significant. That is the place where one would expect to find a statement of the power granted to the licensee.

I do not deem it necessary to carry further an analysis of the two acts (Criminal Abortion Act and Medical Practice Act). I believe that the legislature has made sufficiently clear the meaning which the opinion of the Chief Justice attributes to that legislation. When the legislature has made its meaning manifest, it must be accepted by the courts without equivocation. It is never becoming a court to say to the legislature concerning one of its enactments, "We see what you mean, but, since you have not expressed yourself in the terms which we would have chosen, we will pay no attention to what you said."

Possibly one more observation may be in order. The minority say that the defendant is "a guilty man". Generally, courts confronted with problems

of statutory construction deem irrelevant the identity of the appellant and reserve, until is has agreed upon the meaning of the act under scrutiny, a conclusion as to his guilt or innocence. The identity or culpability of the appellant should not influence the court in construing a challenged statute. But if, in order to sustain a judgment which holds this defendant guilty, we adopt the minority's construction of the challenged legislation, the State of Oregon will pay a big price, for, in that event, legislation which is the product of sixteen years of repeated effort, and which is intended to protect the ethical practitioner but render more certain the conviction of the abortionist, will be reduced to a state of abject impotence.

I concur in the opinion written by the Chief Justice.

TOOZE, J., specially concurring.

I concur with the result reached in the majority opinion. The indictment in this case does not state facts sufficient to state a crime as against a duly licensed physician and surgeon.

Because of the importance of this decision to the medical profession as a whole, as well as to the public in general, and, particularly, to law enforcement officials, I propose to express my views at some length.

There is but one basic issue in this case. That issue involves the question whether the medical practice act authorizes duly licensed physicians and surgeons to perform lawfully an abortion as defined in that law, for the purpose and under the conditions therein prescribed.

The majority holds that it does. With that holding I am in complete accord, as well as with the argument advanced in support thereof both in the majority

opinion and the specially concurring opinion of Mr. Justice Rossman. The minority takes precisely the opposite view. It is their opinion that the medical practice act does not make lawful the performance of an abortion (as defined in the medical practice act) by a duly licensed physician and surgeon upon a woman whose *health* appears in peril because of her pregnant condition (after due consultation with another duly licensed physician and surgeon), and that if such an abortion is performed, the operating physician and surgeon, although his license to practice medicine and surgery may not be revoked on account thereof, may, nevertheless, be prosecuted for manslaughter under the so-called criminal abortion statute.

The entire argument of the minority is devoted to its attempt to bolster that conclusion. Every student of the law will recognize the truism that if such conclusion is false, then it necessarily follows that the entire discussion in support thereof is wholly irrelevant, immaterial, and needs no reply.

I do not disagree with the principles stated in most of the numerous cases cited and quoted from in the minority opinion, nor with the rules of statutory construction to which attention is called. In fact, all members of the court agree upon most of the principles of law stated in both the majority and minority opinions; our disagreement lies in the proper application of those principles to the problem before us. It is my opinion that the principles stated do not warrant or justify the ultimate conclusion of the minority as herein-before stated.

In my judgment, it is clearly demonstrated in the majority opinion, as well as in the opinion of Mr. Justice Rossman, that the conclusion reached by the

minority is unsound, and, if adopted, would lead to absurd results. Upon the basic issue in this case and for the purposes of this opinion, I adopt in its entirety the opinion of Mr. Justice ROSSMAN.

In the construction of statutes, when construction is necessary or proper, the primary and governing rule to be followed and the one that is law and binding upon the court is to ascertain and declare the legislative intent. All other rules of statutory construction are secondary in importance and are simply guides to aid in the application of the primary rule. However, in some decisions these guides have been used as the basis for a lot of mental gymnastics which, in many instances, have simply added confusion to confusion, and have created ambiguities where in truth no ambiguities existed.

Sections 2-216, 2-217, and 2-223, OCLA, provide as follows:

"§ 2-216. * * * In the construction of a statute or instrument, *the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted;* and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all." (Italics supplied.)

"§ 2-217. Intention to govern: General and particular provisions and intents. *In the construction of a statute the intention* of the legislature, and in the construction of an instrument the intention of the parties, *is to be pursued, if possible;* and when a general and particular provisions are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it." (Italics supplied.)

"§ 2-223. Which of two interpretations of statute to prevail. Where a statute is equally suscep-

tible of two interpretations, one in favor of natural right, and the other against it, the former is to prevail.''

The foregoing rules are binding as law upon the court. They comprise a legislative declaration of how its acts shall be construed.

A court is never permitted to resort to and apply rules of statutory construction, in order to reach a conclusion which it may deem desirable, where the language of the statute is plain and unambiguous. It is axiomatic that when the legislature in adopting an act makes use of plain, unambiguous, and understandable language, it is presumed to have intended precisely what its words imply. There is no occasion to go beyond those words and their plain meaning to ascertain, by the application of rules of statutory construction, the legislative purpose. *Fox v. Galloway*, 174 Or 339, 347, 148 P2d 922, 925; 82 CJS 571, Statutes, § 322b (1), (2).

It will be conceded, I am sure, that § 23-408, OCLA, commonly known as the criminal abortion statute, is plain, unambiguous, and couched in understandable language. That also is true, in my opinion, of the medical practice act. In both acts the intention of the legislature clearly appears from the language employed.

In the majority's several discussions of the basic problem before us, reference is made to the legislative history of the medical practice act. That is proper, but not necessary. It is proper simply because it furnishes additional proof that our conclusion upon the basic issue respecting the intent and purpose of the legislature, as determined from the language used in the act, is correct. An examination of the act will

conclusively show that the language used throughout is plain and understandable. It presents no ambiguities. If the law as it now stands were an initial enactment without any prior legislative history, its clear intent and purpose would be and is readily ascertainable from the language employed, and, hence, recourse to rules of statutory construction is unnecessary. 82 CJS 577, Statutes, § 322b (2).

From the language used it is crystal clear that the sole purpose of the act is to license (permit), control, and regulate the practice of medicine and surgery in this state. Every provision of the law is directed to that end. It is a law which is definite, specific, and complete in its terms. Because of the highly specialized training that is necessary to equip one to diagnose and treat the ills of the human body, the law provides a rigid set of qualifications and a technical examination for one who aspires to obtain a license to practice medicine and surgery in this state. Once a license is issued, the act provides a set of definitions (abortion included) and a specific code of discipline for the control and regulation of the licensee, together with a meticulous statement as to the conduct of disciplinary proceedings. The law creates a Board of Medical Examiners, as an agency of the state, to administer the provisions of the act, and prescribes in detail the power and duties of the Board.

A licensee who complies with the provisions of the law is protected in his right to follow his chosen profession. However, if he commits one or more of certain offenses as minutely spelled out in the act, his license may be revoked, and his right to practice medicine and surgery in this state forever terminated.

The statute (§ 54-931, OCLA) lists 17 separate and distinct offenses, for the commission of any of which a license may be revoked. The second offense enumerated is:

"(b) The procuring or aiding or abetting in procuring an abortion *unless* such is done for the relief of a woman whose health appears in peril because of her pregnant condition * * *." Italics supplied.)

It is manifest that the provisions in the act relative to abortions do not constitute the gist of the law; they are but mere incidents to the law's principal purpose—the control and regulation of licensed physicians and surgeons.

The abortion mentioned above is the abortion defined in the medical code. If such an abortion is performed, the license may be revoked, *unless it is done for the relief of a woman whose health appears in peril,* etc., which is equivalent to saying affirmatively that it may be done and the license of the physician and surgeon may not be revoked, if it is done for the relief of a woman whose health appears in peril, etc. Affirmative words in a statute ordinarily imply a negative of what is not affirmed, and negative words therein imply the affirmative of what is not negated. 82 CJS 675, Statutes, § 336.

However, we are primarily concerned in this case with what effect the medical practice act has upon proceedings under the manslaughter statute. For that purpose, the history of the medical practice act is important. It is my opinion that the act changes prior existing laws in two important respects.

As is so conclusively demonstrated by Mr. Justice ROSSMAN, the first and most important effect of the medical code is that it gives authority to duly licensed

physicians and surgeons to perform lawfully certain abortions which, prior to the adoption thereof in its present form, constituted manslaughter under the provisions of § 23-408, OCLA.

The second consideration is in what particulars the manslaughter act has been affected by this legislation for the regulation and control of duly licensed physicians and surgeons.

It is manifest that a duly licensed physician and surgeon would not be amenable to the manslaughter statute for an abortion performed by him according to the terms of the medical practice act, such an abortion being a lawful one, because the same act or course of conduct cannot be both lawful and unlawful at the same place and time and under the same circumstances. *Winslow v. Fleischner et al.*, 112 Or 23, 27, 228 P 101. So to that extent, at least, the manslaughter statute has been affected. It is wholly immaterial whether that conclusion is reached upon the theory of an implied repeal, an implied amendment, or an implied modification.

Although I concur in the result reached in the majority opinion and agree that the indictment in this case fails to state facts sufficient to state a crime against a duly licensed physician and surgeon, nevertheless, I am disposed to go further than its holding as to the effect the provisions of the medical code relative to abortions has upon the manslaughter statute. It is my belief that the medical practice act takes complete jurisdiction over the instances to which it is applicable, and therefore, wherever it applies, the sole penalty for a breach of its conditions is revocation of license, except where otherwise in the act itself a different penalty is provided.

Until the Act of 1937 was passed amending the medical practice act, physicians and surgeons, as well as all other persons, were amenable to the criminal abortion statute for an abortion performed during any stage of pregnancy. To that time the medical practice act itself referred to criminal abortions. Because of such references, and when proper, the provisions of the manslaughter statute were considered in connection with those of the medical practice act as respects abortions. *State v. Ausplund,* 86 Or 121, 167 P 1019; *Board of Medical Examiners v. Eisen,* 61 Or 492, 123 P 52; *State v. Atwood,* 54 Or 526, 102 P 295, 104 P 195; *State v. Clements,* 15 Or 237, 14 P 410.

In 1937 the legislature made a definite change in public policy as to abortions performed by duly licensed physicians and surgeons. The term "criminal abortion" was entirely eliminated from the medical practice act. In 1939 the legislature wrote a definition of abortion in the medical practice act, the first time "abortion" had been defined in this state. That definition was a new one. It covers more than was covered in the definition of abortion at common law. That definition was written solely for the guidance of physicians and surgeons; it applied to no one else.

By dropping from the medical practice act the term "criminal abortion" which had appeared therein continuously for more than 40 years, and substituting therefor what it did, the legislature, in my opinion, indicated a clear intent to remove doctors entirely from liability under the criminal abortion statute for abortions performed as defined in the medical code. That is to say, I am firmly convinced that no duly licensed physician and surgeon is amendable to the provisions of § 23-408, OCLA, for an abortion performed by him, involving "the expulsion of the foetus

at a period of uterogestation so early that it has not acquired the power of sustaining an independent life", as defined in the medical practice act, for the reason that his conduct is regulated and governed exclusively by the provisions of §§ 54-901 to 54-945, OCLA, as amended (the medical practice act).

The medical practice act goes no further than to authorize an abortion under certain circumstances by those persons deemed by the state to be qualified to perform this act, and recognizes the distinction between an abortion at common law and a homicide; while the criminal abortion statute contemplates a homicide by the destruction of the foetus at any time during the period of gestation, extending the common-law rule of "quick with child" to the "moment of conception".

Under the manslaughter statute, all abortions except those necessary to preserve the life of the mother are prohibited and made unlawful. On its face the act applies to all persons, and but for the provisions of the medical practice act would also include duly licensed physicians and surgeons. Prior to the amendment of 1937, they were included. Insofar as duly licensed physicians and surgeons are concerned, the medical practice act now makes lawful what otherwise would be a violation of the manslaughter statute.

It is obvious that the two acts are inconsistent insofar as physicians and surgeons are concerned. The provisions of the medical practice act that permit certain abortions to be performed lawfully are repugnant to the provisions of the criminal abortion act.

As before observed, the medical practice act is in itself a complete code. It fully covers the field of license, control, and regulations of physicians and

surgeons. It provides its own punishments for violation of its terms.

It is well established that repeals by implication are not favored, but when there are two acts on the same subject, if they are repugnant in any of their provisions, "the later act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first". Inconsistent provisions incompatible with each other are thus repealed, leaving the former law in full force and effect in all other respects. *Miller v. School Dist. No. 1, Multnomah Co.,* 106 Or 108, 116, 211 P 174; *Swensen v. Southern Pac. Co.,* 89 Or 275, 279, 174 P 158; 22 CJS 79, Criminal Law, § 27.

In *State v. Preston,* 103 Or 631, 637, 206 P 304, we said:

> "* * * Under the principle of law that where there is a conflict between two statutes, both of which would otherwise have equal force and effect, and the provisions of one are particular, special and specific in their directions, and those of the other are general in their terms, the special provisions must prevail over the general provisions * * *"

The provisions of the medical practice act are particular, special, and specific in their terms. They cover the entire subject matter with which they deal.

Obviously, the legislature had the power to prescribe the conditions under which a licensed physician and surgeon could lawfully perform an abortion, and to provide the penalty that should be imposed upon such licensee for a violation of those conditions. The penalty imposed under the medical practice act is that of revocation of license. In my opinion, that penalty is exclusive.

The legislature was not required to attach criminal responsibility for a violation of the terms of the medical code to make the law a valid one; and yet it did provide a punishment that is highly penal in character—revocation of license, a penalty of great severity and far-reaching consequence to a professional man.

In 41 Am Jur 172, Physicians and Surgeons, § 44, it is stated:

"The license to practice medicine is a valuable property right, and a statute authorizing revocation of a license to practice medicine must be strictly followed. Such statutes are highly penal and must be construed in the physician's favor."

We gave such a strict construction to the provisions of the medical practice act respecting a criminal abortion in *Board of Medical Examiners v. Eisen,* supra, where we reversed a judgment for revocation on the ground that a criminal abortion had been performed, because the complaint for revocation failed to state all the essential averments necessary to state a crime under the provisions of the manslaughter statute, § 23-408, OCLA. Also see *Schramm v. Bank of California,* 143 Or 546, 553, 20 P2d 1093, 23 P2d 327; *Pacific Title & Trust Co. v. Sargent,* 73 Or 485, 490, 144 P 452; *Fuller v. Board of Medical Examiners,* 14 Cal App2d 734. 59 P2d 171, 175; *State Board of Dental Exam. v. Mandell,* 198 Miss 49, 21 So2d 405, 409; *Schireson v. Shafer et al.,* 354 Pa 458, 47 A2d 665, 667, 165 ALR 1133; 23 Am Jur 599, Forfeitures and Penalties, § 2.

Beyond all peradventure of doubt, it was the clear intention of the legislature to permit duly licensed physicians and surgeons, as distinguished from other persons, to perform lawfully certain abortions that as to them, as well as to all others, had theretofore

been condemned by the criminal abortion statute. As to such abortions performed by licensed physicians and surgeons, the criminal statute has no application whatever. This in no way affects its application, as written, to other persons. It is my opinion that by the adoption of the 1937 and 1939 amendments to the medical practice act, physicians and surgeons as a class were removed from the purview of the criminal statute to that extent.

The fact that the practice of medicine, unlike many other lawful occupations, requires special knowledge, training, skill, and care, because of the important interests of health and life which are committed to the physician's care, justifies the legislature in setting them apart in a class by themselves, all in the interests of the public health and safety. Such laws are constitutional. 41 Am Jur 138, Physicians and Surgeons, § 8; 16 CJS 935, Constitutional Law, § 473.

However, the right of a physician and surgeon extends no further than the medical practice act permits. His right is limited to the abortion defined in that law. If a physician and surgeon performs an abortion after the foetus has reached a stage where it has attained the power of sustaining an independent life, as defined in the medical code, he will be guilty of manslaughter, unless such abortion is necessary to preserve the life of the mother, because the medical practice act offers him no protection whatever in such circumstances. In other words, as to such an abortion, he would stand on the same footing as all other persons and be subject to the same criminal responsibility.

Referring to this situation, the minority says:

"Under the medical practice act it is conclusively presumed that the foetus has not acquired power

of sustaining an independent life earlier than 150 days after gestation. Under the majority opinion, a licensed physician could rely upon that conclusive presumption and be sure that for 150 days the medical practice act would apply, and hence, the manslaughter act would not apply. But must a physician, at his peril, determine the exact date on which gestation occurred, that is, on which the impregnating intercourse was had, in order to know whether he will be protected by the medical practice act, or may be liable to conviction for manslaughter?''

An answer to that question will not in any way shed light upon the legislative intention. However, in answer to the question, I will say that if the physician and surgeon places his reliance upon the presumption, he is bound to know the date of conception. Both the conclusive presumption and disputable presumption contained in the definition of abortion relate to and are a species of evidence. They constitute indirect evidence. § 2-401, OCLA. Before either may operate, particular facts must be established upon which to base the same. § 2-403, OCLA; *Hansen v. Oregon-Wash. R. & N. Co.,* 97 Or 190, 224, 188 P 693, 191 P 655. If one is to avail himself of the presumptions, the particular fact upon which the same are based must be established. That fact under the abortion definition would be the date of conception.

But we must not overlook the gist of the definition contained in the first clause thereof; to-wit: ''Abortion shall mean the expulsion of the foetus at a period of uterogestation so early that it has not acquired the power of sustaining independent life.'' In a prosecution for manslaughter against a physician and surgeon, a part of the gist of the crime as to him is that the abortion was performed after the foetus had acquired

the power of sustaining independent life. The indictment must so allege, and the state must prove it. *State v. Clements,* 15 Or 237, 247, supra. If the evidence discloses that conception occurred within 150 days prior to the abortion, the conclusive presumption operates in favor of the physician and demands his acquittal; if the evidence discloses that conception occurred more than 150 days but less than 240 days prior to the abortion, then the disputable presumption becomes operative and a question of fact arises for determination by the jury whether at the time the abortion was performed the foetus had acquired the power to sustain independent life. This determination would necessarily be based upon all the evidence in the case, including the disputable presumption.

The dilemma facing a physician and surgeon as suggested in the minority's question is really not a serious one, but it faces him whether he risks revocation of license or conviction of manslaughter.

The purpose of the presumptions contained in the definition of abortion is clear. The legislature simply did not want physicians and surgeons subjected to the hazards that existed at common law where the question of whether an unlawful homicide, as distinguished from an abortion, was committed depended upon whether the foetus had "quickened" in the mother's womb. The term "quick with child", as known to the common law, is generally defined as and determined from the first moment movement of the foetus is felt by a pregnant woman. 1 Am Jur 139, Abortion, § 18; 1 CJ 312, Abortion, Note 39. It is obvious that the mother only could testify as to that date, and hence conviction rested largely upon the uncorroborated testimony of the woman. The purpose of our definition of abortion is to eliminate en-

tirely the common-law theory of "quickening" and place the matter upon a much more substantial basis; that is, the power of a foetus to sustain an independent life, with certain presumptions to aid in making it effective.

At common law "abortion" was a word used to mean that the life of the foetus or embryo shall be destroyed in the woman's womb, or that a premature birth thereof be caused before it is capable of sustaining life. 1 CJS 312, Abortion, § 1. "Abortion", as such, was never defined as a crime in this state. We have expressly so held. *State v. Farnam,* 82 Or 211, 278, 161 P 417, Ann Cas 1918A 318; *State v. Dunn,* 53 Or 304, 313, 99 P 278, 100 P 258; *Belt v. Spaulding and Rockwell,* 17 Or 130, 136, 20 P 827.

What is said with reference to duly licensed physicians and surgeons applies also to osteopathic physicians and surgeons. By ch 128, Or Laws 1945,— an act almost identical in words with the 1939 amendment to the medical practice act—osteopathic physicians and surgeons were placed on the same footing as licensed physicians and surgeons respecting abortions. In 1951, although the legislature further amended the medical practice act by adding new conditions respecting abortions performed by physicians and surgeons (ch 265, Or Laws 1951), it did not make similar changes in the law governing osteopaths. However, in 1953, the legislature amended the 1945 act relating to osteopaths by making it conform to the changes made in the medical practice act in 1951: ch 183, Or Laws 1953.

Frequent reference has been made to acts of the legislative assembly adopted in 1951 and 1953. It might be well to state that the facts in the instant case arose prior to the effective date of the 1951 Act, and

are governed by the law as it then stood. However, the more or less minor changes made in the medical practice act by the legislation of 1951 would not, even if effective, have any particular bearing upon the issue now before us. However, it is proper for us to refer to this subsequent legislation upon the subject for the purpose of showing that in establishing and maintaining the public policy of this state in the respects under discussion the legislature has been consistent.

I think the clear purpose of the legislature, insofar as abortions performed by duly licensed physicians and surgeons (and osteopathic physicians and surgeons) are concerned, is definitely shown by three of its acts adopted in 1953.

First, by ch 556, Or Laws 1953, the legislature amended the law as to chiropractors. As one of the grounds for revocation of a license, it provided:

"(g) The procuring or aiding or abetting in procuring an abortion, and for the purpose of this Act an abortion shall be deemed to mean the removal from the womb of a woman the product of conception at any time prior to delivery of the child; *provided, nothing in this Act shall be construed to authorize any licentiate under title 54, chapter 3, O.C.L.A., to perform an abortion.*" (Italics supplied.)

There are two very significant features of this provision: (1) the definition of abortion is decidedly different from that appearing in the medical code, and is such an abortion as is made unlawful by the manslaughter statute, unless performed to preserve the life of the mother; and (2) the express provision that the Act was not to be construed as permitting a chiropractor to perform an abortion of any kind.

Second, by ch 555, Or Laws 1953, the legislature amended the law relating to the regulation of the practice of naturopathy and used the identical language employed in the amendment to the chiropractic act, supra.

The intention of the legislature as to chiropractors and naturopaths could not have been expressed more positively. They are not to perform abortions under any circumstances, unless, as permitted by the criminal abortion statute, such abortions are necessary to preserve the life of the mother, and as to such abortions the manslaughter statute permits anyone to act, be he physician and surgeon, chiropractor, naturopath, midwife, nurse, or ditchdigger.

Third, by ch 183, Or Laws 1953, the law regarding osteopathic physicians and surgeons was changed to conform with the 1951 Act relating to physicians and surgeons, in the respects previously noted.

Under the Acts of 1945 and 1953 relating to osteopaths, in the definition of abortion (much different from that appearing in the chiropractic and naturopathic acts), we find no such statement as appears in the last three lines of the definition of "abortion" above quoted from ch 556, Or Laws 1953, nor do we find anything resembling such a statement in any part of the medical practice act or the statutes governing osteopaths.

Relative to abortions, it is manifest that the legislature intentionally made a clear distinction between the different schools of the healing art. It is unnecessary to elucidate the obvious. The conclusions to be derived from the foregoing are inescapable.

Under the theory adopted by the minority, no importance whatever is attached to the drastic changes made in the medical practice act by the Law of 1937

and subsequent acts. It gives no effect whatever to the elimination of the term "criminal abortion" from the act, to the adoption of the specific definition of abortion, nor to the definite wording of subd. (b), § 54-931, OCLA. Despite these highly significant changes in the law, the minority would almost completely ignore them, but not entirely, because as to them it does, in effect, say that the sole purpose and purview of the professional code so far as abortions are concerned is to provide procedure whereby physicians and surgeons may be disciplined civilly by members of their own profession.

This theory will not stand the test of logic, nor is it supported by any principle of law.

In the first place, the medical practice act is not simply a measure to permit physicians and surgeons to police their own profession; no more so than the fish and game code is a measure to permit sportsmen to police their own sport, or the banking code is a measure to permit bankers to police themselves. The Board of Medical Examiners is an agency of the state, just the same as the Fish and Game Commission, the Highway Commission, the State Industrial Accident Commission, and other boards and commissions are agencies of the state. It is the state itself that speaks through its medical board. The powers and duties of the board are minutely spelled out in the law. The act is complete and specific in its regulations and penalties. Very little is left to the discretion of the board. It is obvious that it is the state itself which polices the medical profession, not the physicians and surgeons. If this were not so, the law undoubtedly would be unconstitutional and void.

Moreover, it is evident that the changes made in the law were in no way necessary to enable the medical

board to police the physicians and surgeons. Ample provisions therefor were contained in the prior acts. Certainly the elimination of the term ''criminal abortion'' from the medical practice act and other substantial changes made in the law in no way tended to strengthen the control of the board over licensed physicians nor to tighten the restrictions provided in the act. On the contrary, the restrictions were definitely modified. The minority assigns no sound reason for this modification.

I think even the minority would concede that the legislature has the power to legalize abortions performed by physicians and surgeons to protect *the health* of its citizens, although their *lives* be not in danger!

It needs no argument to establish the proposition that the legislature, if it desired, might in every case leave it solely to the medical judgment of the physician whether an abortion should be performed, and that its was not necessary to require consultation with another doctor, nor that it be performed only to preserve health. The legislature, in matters of this nature, possesses broad powers. There is a difference of opinion upon the question of abortions. Some people, upon religious or other grounds, believe that any abortion is wrong, even though necessary to preserve the life of the mother. Others are of the opinion that birth control is necessary and that abortions in many cases are justified to attain that end. Many have other and different views on the subject. However, regardless of one's own beliefs, it is exclusively the province of the legislature to declare the public policy of the state, not for the court, whose only duty is to interpret and give effect to the legislative will and intent.

. The legislature of this state determined that a duly licensed physician and surgeon might perform an abortion as defined, when *the health* of the mother was in peril because of her pregnant condition, and after consultation with another physician. Under the medical practice act, preserving the *health* of the mother is the criterion; while under the criminal abortion statute, no abortion can be performed except to preserve the *life* of the mother. It requires no argument to establish the fact that there is a vast difference between "preserving health" and "preserving life".

We need give ourselves no concern about a possible abuse by physicians and surgeons of the power vested in them by the provisions of the medical practice act. It must be remembered that they belong to an honorable and ethical profession and are bound by the Hippocratic oath, an important part of which is: "I will give no deadly drug to any, though it be asked of me, nor will I counsel such, and especially I will not aid a woman to procure abortion."

Although not expressly stated therein, a careful perusal of the opinion written by the minority will reveal that those members of this court consider the criminal abortion act as almost sacrosanct. They seem to feel that it takes precedence over all other law in much the same way that a fundamental law dominates ordinary law. All statutes enacted by the legislature are important, but no one of them is more important than the others. All are pronouncements of our legislature, and none of its pronouncements is written in italics. Courts have no favorites among the numerous enactments of the legislative body. However, a rule which is hoary with age cautions us that if two interpretations of the governing legislation are equally

available, one of which will view the individual's conduct as lawful and the other as criminal, the former is the choice that should be made, for unless a court feels morally certain that the legislature intended that the accused should be deemed a felon, it should not adjudge him one. In effect, the legislature has so declared. § 2-223, OCLA, supra.

The state prosecuted this case against defendant upon the theory adopted by the minority that the medical practice act did not authorize physicians and surgeons to perform lawfully an abortion as defined in that law, for the purpose and in the manner therein provided. It urged the same contention on this appeal. On the trial the defendant, by challenging the sufficiency of the indictment, by objections to the testimony, and by exceptions to the court's instructions to the jury, raised the same questions he has presented in this court. The trial court at the very outset of the trial adopted the state's theory relative to the law, overruled all of defendant's objections, and submitted the case to the jury accordingly. The trial court erred.

The record before us reveals that defendant did not testify in his own behalf upon the trial of this case. Therefore, we have no explanation from him regarding the matters testified to by the state's witnesses. In the absence of a satisfactory explanation, the facts established by the state's case would have warranted a revocation of defendant's license to practice medicine, but it did not warrant his prosecution for the crime of manslaughter, because the alleged abortion was performed well within the 150 days after conception, and, in my opinion, was governed exclusively by the provisions of the medical code.

The facts in this case as presented by the state's witnesses disclose a most aggravated situation, but that should not deter us from correctly interpreting and applying the law. We should never attempt to make law to fit the facts of a particular case, no matter how revolting the circumstances of that case may be. Of course, courts have at times done just that, but usually with shocking results. Bad cases have resulted in the making of bad laws, and as Edmund Burke said: "Bad laws are the worst sort of tyranny."

PERRY, J., specially concurring.

I concur in the result announced in the majority opinion as I am convinced that the Medical Practice Act authorizes a duly licensed physician and surgeon to perform lawfully an abortion as defined in that statute. And such lawful act would not constitute manslaughter on the part of such a physician in violation of § 23-408, OCLA. Therefore, the indictment in this case does not state facts sufficient to state a crime against a duly licensed physician and surgeon.

Also, I am convinced that if an abortion is performed by a duly licensed physician and surgeon, but he fails to comply with the regulations surrounding the doing of that act, if it be an abortion as defined in that act, then the punishment is revocation of his license and not as for manslaughter under the criminal statute. Therefore, I concur in the special concurring opinion of Mr. Justice Tooze.

BRAND, J., dissenting.

The decision this day made will render difficult, if not impossible, any effective effort on the part of

law enforcement agencies to punish any violators of the criminal statute relative to abortions.

A criminal statute was enacted. An indictment was drawn in strict conformity therewith. Proof was made of all the allegations of the charge. The jury found the defendant guilty. This court reverses the conviction because it holds that another law, passed for a different and limited purpose, has transformed the clear language of the criminal statute into a labyrinthian maze of confusion and uncertainty which no trial court could clearly define, and no jury could understand. The indictment against the defendant Buck was brought pursuant to the provisions of OCLA, § 23-408 which is a part of the penal code and which defines manslaughter. That act was adopted in 1864 and has ever since remained on the books in its original form. It reads as follows:

"If any person shall administer to any woman pregnant with a child any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall be necessary to preserve the life of such mother, such person shall, in case the death of such child or mother be thereby produced, be deemed guilty of manslaughter." OCLA, § 23-408.

The position of the defendant is that the enactment of OCLA, §§ 54-901 and 54-931 operated either as a partial repeal of the manslaughter act or as an amendment of it; that the two acts should be construed together and that if so construed the law concerning manslaughter would be so changed that the act charged in the indictment would not be a crime.

The majority opinion avoids any discussion of the law of partial repeals by implication or amendments

by implication, but the majority will perhaps agree that the manslaughter act, OCLA, § 23-408, means exactly what it says and what it meant in 1864, unless it has been changed by subsequent legislation. And they will not suggest that there is any other legislative way of changing a statute save by amendment or partial repeal. The opinion acknowledges that there is presented a choice between repeal (meaning partial repeal) by implication, and amendment by implication. I shall show that there is no valid distinction between them. The opinion recognizes that ordinary persons and chiropractors and naturopaths are still "amenable" to the provisions of the manslaughter act. The majority opinion would leave the manslaughter act just as it was written except that they would place physicians and surgeons "in a class by themselves" but only to the extent that the medical practice act accomplishes that result. There is nothing else to accomplish it. The majority opinion insists that "related" statutes must be construed together as if they were one law. Whether the two acts are so related is the question at issue.

We are told by the majority that their position is "crystal clear", "conclusive", "beyond peradventure of doubt", and that their conclusion follows "as the night the day". I shall not compete in the employment of absolutes. My only appeal is to legal reasoning as against the persuasive power of emphasis and repetition.

The majority opinion expressly concedes that the medical practice act and the manslaughter act "conflict." A concurring opinion states that they are "repugnant." All three majority opinions assert that the two acts must be read and construed together. I submit that two repugnant and conflicting acts cannot

be "construed together." The majority fails to distinguish between rules of construction and rules of implied amendment or repeal. There is no problem of statutory construction in this case. The manslaughter act on its face is and always has been clear and unambiguous. The medical practice act is also clear and unambiguous. The ambiguity arises only when the court attempts to read them together. The numerous authorities cited by the majority on the rules of statutory construction are not apposite. It is true that where an enactment is ambiguous other statutes dealing with the same subject are sometimes considered as bearing upon the meaning of the words used.

When two statutes are in pari materia and can be harmonized they may be read together "as if they were one law." But if both acts are clear and unambiguous and are in conflict, then the only problem is whether the later act has impliedly amended or repealed the former. The majority opinion would apply the rules of statutory construction and would read repugnant statutes "as if they were one law", although a concurring opinion expressly states that when the legislature makes use of plain unambiguous language there is no occasion for the application of the rules of statutory construction. The doctrine for harmonizing repugnant statutes is unique in the annals of law.

I venture one more comment upon the majority opinion before discussing the merits. I respectfully suggest that the opinion begs the question at issue. We have no occasion to construe the two acts as if they were one, unless we first find that the medical practice act impliedly modified the manslaughter act. The opinion first argues that the medical practice act makes lawful an act prohibited by the manslaughter

act. It then repeatedly argues that it would be absurd to convict a physician for an act under one statute which is made lawful by another. To this, I agree. The only question is whether the medical practice act does make lawful an act forbidden by the manslaughter act.

No question is raised as to the sufficiency of the indictment under the provisions of OCLA, § 23-408 if that act has not been changed by amendment or partial or total repeal. There is no challenge to the proposition that if the defendant is amenable to the provisions of § 23-408 as written, there was substantial evidence on the record to support the conviction. The provisions of OCLA, §§ 54-901 and 54-931 which the majority opinion would read into the manslaughter act were enacted by chapter 153 of the Laws of 1939. They are to be found in the "Business and Professions Code", and in the portion thereof which relates only to physicians and surgeons. I quote:

> "The board may refuse to grant a license to any applicant who desires to practice medicine and surgery in this state or may suspend or revoke such licenses for any of the following reasons:
>
> "* * * * *
>
> "(b) The procuring or aiding or abetting in procuring an abortion unless such is done for the relief of a woman whose health appears in peril because of her pregnant condition after due consultation with another duly licensed medical physician and surgeon;
>
> "* * * * * *" OCLA, § 54-931. (Oregon Laws 1939, ch. 153, § 6(b)).
>
> "*When used in this act,* the following terms will have the following meanings, unless otherwise limited:
>
> "* * * * *

" 'Abortion' shall mean the expulsion of the foetus at a period of uterogestation so early that it has not acquired the power of sustaining an independent life; provided it shall be conclusively presumed for the purpose of this statute that the foetus has not acquired such power earlier than one hundred fifty (150) days after gestation, and a disputable presumption of lack of such power shall arise if the expulsion take place earlier than two hundred forty (240) days after gestation." OCLA, § 54-901. (Italics mine.)

The definition and the substantive and evidentiary rules stated in OCLA, § 54-901 have no relation to the manslaughter statute. They apply only "When used in this act." If the legislature intended that the definition of abortion in OCLA, § 54-901 should alter the meaning of the manslaughter act which does not even use the word "abortion", why did the legislature preface the definition of that word, when used in the medical practice act, by saying "When used in this act"? Was the manslaughter act "this act"? The manslaughter act provides for the punishment of any person who does the specific acts described therein, whether it be called the performing of an abortion or not. The crime described in that act is not the crime of abortion as known to the common law. The act does not contain any definition of "abortion" nor does its meaning depend upon any definition of "abortion." *State v. Ausplund,* 86 Or 121, 167 P 1019. In that case the court said:

" * * * The legislature did not waste time with refinements about quickening, but applied the law to all stages of pregnancy and *we would usurp its prerogative if we read into the statute something not found there.*" (Italics added.)

The basic issue in this case is whether the quoted

provisions of the medical practice act which govern the issuance and revocation of licenses have changed the law as clearly set forth in the manslaughter act, and have, either wholly or partially, excluded physicians and surgeons from the purview of that act. Those provisions could have that effect only if, under well-recognized rules, they operated as an implied repeal of the manslaughter act, either in whole or in part, or as an implied amendment thereof. It is not claimed either by the defendant or by the majority opinion that the manslaughter act was repealed in toto. The adherents to the majority opinion appear to be in disagreement as to whether the manslaughter act has been repealed in part, by implication, or amended by implication. It is held on eminent authority that repeal by implication, when only a part of the prior statute is repealed, is identical with amendment by implication. Sutherland, Statutory Construction, 3d ed, Horack, § 1922. Many authorities support the statement of Sutherland by applying the same tests as to implied amendments which prevail as to implied repeals. For example: "Repugnancy." *Rickards v. State*, 6 Terry 573, (Del), 77 A 2d 199, 203. "Irreconcilable conflict." *Co-ordinated Transport v. Barrett*, 412 Ill 321, 106 NE2d 510. Inconsistency "so * * * that they cannot stand together." *Inman v. Willinski*, 144 Me 116, 65 A2d 1. (Citing Sutherland.) "Unavoidable necessity." *Belknap v. Shock*, 125 W Va 385, 24 SE2d 457. See also *Genereaux v. Petit*, 172 Wash 132, 19 P2d 911; *Lineberger v. Bagley*, 231 Iowa 937, 2 NW2d 305; *Harding v. Mutual Benefit Health & Accident Ass'n*, 55 Idaho 131, 39 P2d 306; *Taelman v. Board of Finance*, 212 Ind 26, 6 NE2d 557; *Swettman v. Remington Rand*, 65 F Supp 940; *United States v. Madigan*, 300 US 500, 81 L ed

767; *City of Wilkes-Barre v. Pennsylvania Pub. Util. Co.,* 164 Pa Super 210, 63 A2d 452; *State v. Amman,* 78 Ohio App 10, 68 NE2d 816; *Fournet v. Tugwell,* 199 La 18, 5 So2d 370. Thus it appears that it is a matter of indifference whether we speak of implied amendments or implied repeals when we mean modification or change of a statute. Since this is true, the issue may be simply stated thus: I assert that the manslaughter act has not been altered, either by implied amendment or repeal. In this state there are serious objections to applying the doctrine of implied amendment in addition to those applicable to implied repeal. Article IV, § 22 of the Constitution provides:

> "No act shall ever be revised or amended by mere reference to its title, but the act revised or section amended shall be set forth and published at full length."

This section is not cited for the purpose of proving that so-called implied amendments are impossible. It is cited to show the narrow scope within which this court has confined the doctrine of implied amendments in view of the constitutional provision.

In *Martin v. Gilliam County,* 89 Or 394, 173 P 938, it was argued that the 1915 Road District Act amended the 1913 Budget Act by implication. The court said at 397:

> "This act does not come within the spirit of the cases which very guardedly and reluctantly uphold repeals by implication. Here there is no attempt to enact a new and independent statute upon the same subject as the act of 1913, supra, but an attempt to insert into it, and by reference to it, certain provisions enlarging its scope without setting forth the statute as it would appear after being so revised. If it can be done in this instance there is no limit to the extent to which

statutes can be revised or amended without setting forth the amended statute at full length, and the constitutional provision above quoted would, therefore, be rendered nugatory. * * *''

The same reasoning is applicable here.

The rules concerning implied repeals are well established. If earlier and later statutes are in irreconcilable conflict, then the earlier must yield to the later by implied repeal. *Anthony et al. v. Veatch et al.,* 189 Or 462, 220 P2d 493, 221 P2d 575, syl. 14. *Rorick v. Dalles City,* 140 Or 342, 12 P2d 762. If a later act covers the whole subject of the first, and embraces new provisions plainly showing that it was a substitute for the first act, it will operate as a repeal of that act. *State ex rel. Washington-Oregon Investment Co. v. Dobson,* 169 Or 546, 130 P2d 939.

In *Ulrich et al. v. Lincoln Realty Co. et al.,* 180 Or 380, 168 P2d 582, 175 P2d 149, this court said:

"It is a familiar rule that repeals by implication are not favored. Noble v. Noble, 164 Or. 538, 549, 103 P. (2d) 293, and cases there cited. 'A repeal by implication', Mr. Justice Harris said in Swensen v. Southern Pacific Co., 89 Or 275, 279, 174 P. 158, 'is effected if there be such positive repugnancy between the new and the old enactments that they cannot stand together or be harmonized', but 'one statute is not repugnant to another unless they relate to the same subject *and are enacted for the same purpose.*' See, to the same effect, Pacific Elevator Co. v. Portland, 65 Or. 349, 388, 133 P. 72, 46 L.R.A. (N.S.) 363.'' (Italics supplied.)

In *State ex rel. v. Chandler et al.,* 180 Or 28, 175 P2d 448, we said:

"* * * Any reasonable construction which will give effect to all these statutes should be adopted.

Pacific Elevator Co. v. Portland, 65 Or. 349, 387, 133 P. 72, 46 L.R.A. (N.S.) 363.''

In *Pacific Elevator Co. v. Portland,* 65 Or 349, 133 P 72, this court said:

"One statute is not repugnant to another unless they relate to the same subject and are enacted for the same purpose. When there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed by the latter. * * *''

From Corpus Juris Secundum the controlling rules are clearly set forth and are supported by some hundreds of decisions. The text is as follows:

"The repeal of statutes by implication is not favored. The courts are slow to hold that one statute has repealed another by implication, and they will not make such an adjudication if they can avoid doing so consistently or on any reasonable hypothesis, or if they can arrive at another result by any construction which is fair and reasonable. Also, the courts will not enlarge the meaning of one act in order to hold that it repeals another by implication; nor will they adopt an interpretation leading to an adjudication of repeal by implication unless it is inevitable and a very clear and definite reason therefor can be assigned.

"Furthermore, the courts will not adjudge a statute to have been repealed by implication unless a legislative intent to repeal or supersede the statute plainly and clearly appears. The implication must be clear, necessary, irresistible, and free from reasonable doubt.

"The foregoing rules are particularly applicable where the statute claimed to be repealed is of long standing, has for a long time been rigidly adhered to and construed as being in existence, as well as where it has been judicially construed and acted on, or where subsequent legislation shows

that the legislature deemed it still in existence, or where the statute allegedly repealed and the repealing statute were both enacted at the same legislative session, as discussed infra § 297. Also, the rules are especially applicable where a repeal would lead to absurd consequences, or where the alleged repeal would disturb an established system of written law, covering a vital field in the system of government, or where the statute allegedly repealed is an important one relating to a governmental matter, and a repeal would be destructive and ruinous of the public welfare, impair a settled prerogative of the government, or leave no law whatever on a subject concerning which it is necessary that there be a positive law of some sort." 82 CJS, Statutes, § 288.

"The absence of a repealing clause in the subsequent statute is a circumstance for consideration in determining whether it operates as a repeal of the prior statute, but it is not determinative, and the fact that compilers have seen fit to include both statutes in separate sections of the same compilation of statutes affords an argument against repeal by implication. A statute defining a substantive offense is not repealed by a code relating only to criminal procedure." 82 CJS, Statutes, § 303.

"* * * The repeal of a law is a matter of legislative intent, and ought never to be inferred when the effect of such repeal by implication would be to leave no law whatever on a subject about which it is quite certain the Legislature meant (since necessity requires) that there should be a positive law of some sort." *Bartmess v. Hendricks,* 150 La 627, 91 So 68.

In *Swensen v. Southern Pacific Co.,* 89 Or 275, 174 P 158, this court said:

"* * * A repeal by implication may be effected when a later conflicts with a prior statute or when one is intended as a substitute for another act. It is so easy for the legislature, when adopting one

statute, to say that another statute on the same subject is repealed, and an intention to repeal, when it exists, is so likely to be expressly stated, that the courts will not presume that the later repeals the prior statute unless the two are so obviously in conflict that both cannot be executed. A repeal by implication is effected if there be such positive repugnancy between the new and the old enactments that they cannot stand together or be harmonized; but the courts will, however, if possible, construe the two statutes together and adopt any reasonable construction which will sustain both of them: Palmer v. State, 2 Or. 66, 69; Winters v. George, 21 Or. 251, 257 (27 Pac. 1041); Pacific Elevator Co. v. Portland, 65 Or. 349, 387 (133 Pac. 72, 46 L.R.A. (N.S.) 363); Messick v. Duby, 86 Or. 366, 369 (168 Pac. 628). If the new statute revises the subject matter of the old and is plainly intended as a substitute it will operate as a repeal of the old statute: Strickland v. Geide, 31 Or. 373, 376 (49 Pac. 982). One statute is not repugnant to another unless they relate to the same subject and are enacted for the same purpose: * * *."

In *United States v. Tiplitz,* 105 F Supp 512 (NJ 1952), the court said:

"* * * It must be assumed that Congress in enacting a statute acts with full knowledge of existing statutes relating to the same subject matter, and where express terms of repeal are not used, the presumption is against an intention to repeal an earlier statute."

In *City of Geneseo v. Illinois Northern Utilities Co.,* 378 Ill 506, 39 NE2d 26, 37, the court said:

"* * * The repeal by implication of one act by a later act is not effected by mere conflicts or inconsistencies between them, but only where the carrying out of the later act prevents the enforcement of any part of the former. To the extent they are in conflict the first act is repealed, but

the parts of the first act not affected remain in full force and effect.''

In *Belknap v. Shock,* 125 W Va 385, 24 SE2d 457, the statute in question contained an express provision that all acts or parts of acts ''inconsistent with this act are hereby repealed.'' ''Inconsistency'' was the test in that case, not irreconcilable conflict, yet the court said:

> '' \* \* \* This sentence is a part of the very substance of the act, and must be given effect precisely as any other part. But observe the exact words used. No act or part of an act is repealed except such as are 'inconsistent' with the new enactment. The word 'inconsistent' when so used is not to be loosely construed. It does not mean merely, inharmonious, inappropriate, illogical, unsymmetrical, but connotes impossibility of concurrent operative effect. To be automatically repealed by a subsequent statute, the two acts must be so conflicting that their common survival is a legal impossibility, or that only one can be in force at a given time. The two laws must be so antagonistic that they cannot co-exist. Two antithetical statutes cannot cover the same subject matter at the same time. One must yield to the other from sheer necessity, and by universal practice, the later in time is held to prevail. Thus the inconsistency which will result in the abrogation of one statute by another must be such as will make it impossible as a matter of law that they can both be effective. \* \* \* ''

In *City of Portland v. Duntley,* 185 Or 365, 387, 203 P2d 640, this court said:

> ''The position of the defendant involves a disregard of the fundamental rule that repeals by implication are not favored. Ulrich v. Lincoln Realty Co., 180 Or 380, 403, 168 P (2d) 582, 175 P (2d) 149, and cases there cited. 'There must be a posi-

tive repugnance between the provisions of the new law and those of the old, and even then the old law is repealed by implication only to the extent of the repugnance.' * * *.''

In *Webber v. Bailey*, 151 Or 488, 493, 51 P2d 832, it was contended that one statute concerning the issuance of bonds was repealed by another. The court laid down the following general principles:

" * * * A statute may be repealed by implication, but such a repeal is not a favorite of the law. There is a presumption that all laws are passed with knowledge of the laws as they exist and that if the legislature desires to repeal a statute then it should so declare. * * *''

All of the consideration militating against implied repeal are equally potent as against implied amendment of a criminal statute by a provision of a statute relating to noncriminal proceedings enacted for a different purpose.

''It has been very generally stated that amendments of statutes by implication are not favored and will not be upheld in doubtful cases. Ordinarily, the enactment of a law will not be held to have changed a statute that the legislature did not have under consideration at the time of enacting such law, and implied amendments cannot arise merely out of supposed legislative intent in no way expressed, however necessary or proper it may seem to be. An intent to amend a statute will not be imputed to the legislature unless such intention is manifestly clear from the context of the legislation; and an amendment by implication, or a modification of, or exception to, existing law by a later act, can occur only where the terms of a later statute are so repugnant to an earlier statute that they cannot stand together. * * *'' 82 CJS, 419, Statutes, § 252. (Citing many cases.)

The majority places great reliance upon *Multnomah County Fair Ass'n v. Langley,* 140 Or 172, 13 P2d 354, and *City of Portland v. Duntley,* supra, 185 Or 365, 203 P2d 640. It is said they create a situation "on all fours" with that in the case at bar. In the first of these cases the court held that the operation of betting on races under the system proposed, was not the carrying on of a lottery but was a violation of the nuisance statute. In *City of Portland v. Duntley,* the question was whether a city ordinance denouncing bookmaking, pool selling and the like was in conflict with state law. It was held that the city ordinance was valid. The court said:

> "The position of the defendant involves a disregard of the fundamental rule that repeals by implication are not favored. Ulrich v. Lincoln Realty Co., 180 Or. 380, 403, 168 P. (2d) 582, 175 P. (2d) 149, and cases there cited. 'There must be a positive repugnance between the provisions of the new law and those of the old, and even then the old law is repealed by implication only to the extent of the repugnance.' * * * *"

As stated in the majority opinion in the case at bar, this court in the Duntley case considered the State Racing Act and said that the only effect of that act was to except regulated pari mutuel wagering at a race track from the operation of the Oregon nuisance statute. But the very title of the State Racing Act read in part, "providing for mutuel wagering". The statute licensed the very act which would have been violative of the nuisance statute. It limited the "take" of the licensee to $12\frac{1}{2}$ per centum of the gross receipts *of any wagering system* and provided that the licensing provisions should not prevail as to races where wagering is not permitted. It referred to certain race meets

where mutuel wagering *shall be permitted*. In other words, it expressly authorized and licensed pari mutuel wagering. These cases bear no resemblance to the case at bar. The medical practice act does not license the very act prohibited by the manslaughter statute. The only license mentioned is one which permits doctors to practice their profession. The medical practice act on its face merely authorizes the revocation of a license for some but not all of the acts prohibited by the manslaughter act. The authorization in this case of a supplemental remedy by revocation of a license is not the same as the authorization in the Racing Act case to commit the very act prohibited in the earlier statute.

The error which has permeated the entire argument in support of the defendant is found in the repeated assumption that certain abortions are made lawful by the medical practice act, which are declared to be criminal by the manslaughter act. If that be assumed, then it would take little persuasion to show that specified conduct could not be both lawful and criminal at the same time. The difficulty is that those who support this argument are assuming the ultimate question at issue. The frequent repetition of the conclusion of the majority does not, to my mind, strengthen the premises upon which the conclusion rests.

The established tests by which we must determine whether any acts made criminal by the manslaughter act have been made lawful by the medical practice act may be summarized briefly: Did the later act cover the entire field occupied by the former? Is there irreconcilable conflict or positive repugnancy between them, or can both be enforced or harmonized? Do they relate to the same subject, and are they "enacted

for the same purpose"? Even if they relate to the same subject, is there a difference "in the whole purview" of the two statutes? Did a legislative intent to repeal or supersede plainly and clearly appear? Would the enforcement of the one prevent the enforcement of the other?

The manslaughter act is a part of the penal code. The commission of the prohibited acts is a crime. The medical practice act is a civil provision for the regulation of the medical profession by a medical board. While it authorizes the revocation of a license for committing an abortion under certain circumstances, it nowhere makes the performing of any abortion criminal, nor does it declare that all abortions are lawful except those for the performance of which a license may be revoked. The manslaughter act imposes punishment. The medical practice act, while in some respects penal in nature, and therefore requiring strict construction, was not passed for the purpose of punishment, and revocation of a license is not punishment in the eyes of the law. 59 CJ 1110, Statutes, § 658.

In *Meffert v. State Board of Medical Registration and Examination,* 66 Kan 710, 72 P 247, 251, the court said:

"* * * The revocation of a license to practice medicine for any of the reasons mentioned in the statute was not intended to be, nor does it operate as, a punishment, but as a protection to the citizens of the state. * * * It has never been thought that the withholding or revocation of such license was in any sense a punishment. If the revocation was intended as a punishment, there might be force in this argument, but since the only purpose of the law was to require a certain standard

of morals of the physician, the argument is without force."

The holding was approved in a later case in which the court said:

"In the Meffert Case it was expressly held a proceeding to revoke a physician's license is not criminal in its nature, and the purpose is not punishment of the delinquent. * * *" *Brinkley v. Hassig*, 130 Kan 874, 289 P 64, 66.

This court has thrice announced the same rule concerning the disbarment of attorneys. The purpose of such proceedings is " 'not * * * to punish the accused attorney, as in matters of criminal cognizance, but * * * as "necessary for the protection of the court, the proper administration of the justice, and the dignity and purity of the profession, and for the public good and the protection of clients' ": *Ex parte Finn*, 32 Or 519, 52 P 756, 67 Am St. Rep 550." *In re Moynihan*, 166 Or 200, 111 P2d 96.

Speaking of the granting and revocation of licenses to practice law, this court said:

" * * * In neither case is the court's office that of punishment. In both it is vindication of ethical standards and protection of the legal profession and the public." *In re Smith*, 171 Or 151, 160, 134 P2d 956.

To the same effect see *Butcher v. Maybury*, 8 F2d 155.

In a suit for injunction to restrain proceedings for the revocation of the license of a physician, the Supreme Court of Indiana said:

" * * * it is sufficient * * * to say that the facts stated in the charges, the trial of which appellee seeks to enjoin in this case, do not constitute a public offense, nor is it claimed that they

constitute such offense; * * *." *Spurgeon v. Rhodes,* 167 Ind 1, 78 NE 228.

See also *Tapley v. Abbott,* 111 Cal App 397, 295 P 911; *Bold v. Board of Medical Examiners,* 135 Cal App 29, 26 P2d 707; *Traxler v. Board of Medical Examiners,* 135 Cal App 37, 26 P2d 710; *State v. Lewis,* 164 Wis 363, 159 NW 746.

Again, the trial and punishment for crime is an exercise of "the judicial power of the state", whereas the proceedings of an administrative board in revoking a license do not involve an exercise of the judicial power.

In the Spurgeon case, supra, 167 Ind 1, 78 NE 228, the court said:

"* * * Statutes containing a provision like the one in question here, authorizing the board to revoke a license when the holder has been guilty of a felony or of gross immorality, have been held not to violate any provision of the federal or state Constitutions, and it has been held that the granting or refusing to grant a license to practice medicine, or the revocation thereof by the board, is not the exercise of judicial power." Citing many cases.

The court quoted with approval from *State v. Webster,* 150 Ind 607, 621 50 NE 750, 755, as follows:

"* * * 'While in some respects quasi judicial, the action of the board is not judicial, any more than is the action of a county surveyor in fixing a boundary line, or of a county superintendent in giving or refusing a teacher's certificate, or the action of numberless other officers or boards in making investigations and decisions in matters committed to them. Neither is the circumstance that an appeal is allowed from a decision of the board an indication that its action is judicial. "The right of appeal from the action of boards in their admin-

istrative character," it was said by this court in Board v. Heaston, 144 Ind. 583, 41 N.E. 457, 43 N.E. 651, 55 Am. St. Rep. 192, "is frequently conferred by statute. The appeal in such cases is not permitted because the action of the board is considered judicial, but it is granted as a method of getting the matter involved before a court that it may be determined judicially." ' "

In *Suckow v. Board of Medical Examiners,* 182 Cal 247, 187 P 965, the Supreme Court of California said:

"" * * * Nevertheless it is now well established in this state that tribunals such as the board of medical examiners or other boards empowered to revoke licenses which they have previously granted, for cause defined by the law, are not courts in the strict sense; they are not exercising 'the judicial power of the State' as that phrase is used in the Constitution conferring judicial power upon courts, * * *."

It is difficult to see how it can be argued that a statute providing quasi judicial administrative action covers the field of a criminal statute, or is a substitute therefor, when the revocation of a license by a board does not involve an exercise of judicial power, and when the trial of a criminal charge does constitute the exercise of such power. If the administrative provision does not occupy the field of the criminal statute, then there is no repugnancy between them and both must stand. It is true that the courts hold that statutes authorizing revocation of licenses are to be strictly construed, but that merely means that a license is not to be revoked unless the act done clearly comes within the terms of the statute authorizing revocation. That rule of strict construction cannot be tortured into a holding that the act authorizing revoca-

tion is to be broadly construed in order to make it incompatible with a criminal statute. See also *United States ex rel. Marcus v. Hess,* 317 US 537, 87 L ed 443. A criminal intent is a material element of the crime of manslaughter and we may fairly assume that no physician would ever be convicted unless such intent was proven. No element of criminal intent is involved in administrative proceedings for the revocation of a license.

It has been argued, in substance, that under the provisions of the medical practice act, a doctor's license may be revoked if he performs an abortion under conditions therein specified. From this statement the conclusion is drawn that it must be lawful to perform it, if the act performed would not authorize revocation of the license. This might be true if there were no manslaughter act, but it cannot be true under that act unless there has been an implied amendment or repeal, which is the question for decision here.

Again, it has been earnestly urged that the medical practice act has made the revocation of a license the exclusive penalty. There is not a word in the physicians professional code which declares that the commission of an abortion under the conditions prescribed in that code is lawful or that the manslaughter act is modified, amended or repealed thereby. And there is not a word in the professional code which states that the revocation of a license is the "exclusive penalty." It is true that the doctrine expressio unius est exclusio alterious applies to the medical practice act. The professional code specifies the grounds on which a license may be revoked and the grounds specified are, no doubt, exclusive. But the fact that the grounds for revocation stated in the professional code are exclusive cannot be tortured by a Latin maxim into

a holding that a statute which does not deal at all with the subject of criminality of abortions by physicians, is exclusive, or covers the field or exempts physicians from the purview of a criminal statute. Yet, such contention has been made in the argument for reversal of the conviction. Again, the manslaughter act applies to "any person". The medical practice act applies only to physicians and surgeons, and only to some of them.

The medical practice act contains three sections only which define crimes. Under section 54-941, OCLA, it is a misdemeanor to practice medicine without a license. Under section 54-942 it is made a misdemeanor to procure a license by fraud or to practice under a false name. Under section 54-943 it is made a misdemeanor to fail to procure a certificate of annual registration. Section 54-945 prescribes the penalty to be imposed if any person shall be found guilty of a misdemeanor under the act. The professional code contains no provision whatever making unprofessional or dishonorable conduct a misdemeanor, nor is the procuring or aiding or abetting in procuring an abortion, as defined in the code, or otherwise, or under any conditions, made a criminal offense, much less is it defined as a felony.

The medical practice act deals with two different fields of professional activity by doctors. Certain conduct is made criminal by that act. Other conduct is merely ground for revocation of license. Abortion is in the latter class. Is it not reasonable to suppose that when the legislature was classifying acts as criminal and noncriminal in the medical practice act, they would have included abortions in the class of criminal acts if they intended that the provision on that subject would alter the manslaughter act?

In 1895 the medical practice act authorized revocation of a license for procuring "a criminal abortion". That phrase, of course, referred to the manslaughter act, since there was no other statute on the subject. The 1937 law eliminated the words "criminal abortion" and the 1939 law inserted the provisions now found in OCLA, § 54-931. It has been argued that these changes indicated an intent to alter the manslaughter act, but the obvious purpose of the change was to apply a different rule to proceedings for revocation of a license, from that which controlled in determining guilt under the manslaughter act. The sole exception relates to cases in which a physician has been convicted under the manslaughter act. As to such cases, the 1939 act provides for revocation of license merely upon proof of conviction of any offense for which the punishment may be incarceration in a state prison. OCLA, § 54-931 (i). The manslaughter act is punishable by imprisonment in the penitentiary.

There is another circumstance which shows that the medical practice act was not passed for the same purpose as the manslaughter act. The manslaughter act provides punishment for acts resulting in the death of the child or the mother, but under the medical practice act, the killing of the mother would be immaterial on the issue of revocation of license. Notwithstanding these facts, the majority persists in holding that the medical practice act covers the same field and was enacted for the same purpose as the manslaughter act, and that the two acts are repugnant.

There are other differences in the two acts, which indicate differences in their legislative purpose. Under the manslaughter statute, it is a defense if the act done was necessary to save the life of the mother. That necessity may result from any serious condition of

the mother endangering her life, whether it be caused by her pregnant condition or otherwise. Under the professional code, however, the procuring of an abortion is ground for revocation of license, but not if the mother's health appears in peril *because of her pregnant condition.* Thus, in some respects, the provisions of the professional code authorizing revocation of a license are more stringent than the provisions of the Penal Code, authorizing conviction for manslaughter, while in other respects, they are more lenient.

I find no "positive repugnancy" between the two types of statute, one of which imposes upon prosecutors and courts the duty of enforcing a strict rule by criminal prosecution, while the other imposes a less onerous duty upon a medical board, in dealing with members of its own profession. Whatever may be said as to the wisdom of this distinction between the duty of courts and of administrators, there is surely no constitutional or other mandate which requires the legislature to make the civil jurisdiction of an administrative board coextensive with the criminal jurisdiction of a court. I shall later show that the legislature contemplated that the criminal provisions should remain effective and be invoked in such cases.

Hitherto we have sought the intent of the legislature by the traditional method of examining the two statutes to determine whether they were passed for the same purpose and whether they related to the same subject and were or were not repugnant. We now turn to evidence extrinsic of the two statutes for indications of the legislative intent: (1) The changes of 1937 and 1939 in the medical practice act were made 16 or more years ago, yet the biennial legislatures from 1937 to date have left the manslaughter act in

the criminal code just as it was in 1864. If they desired to amend or repeal it they would have said so. (2) A statute was passed in 1927 authorizing the revocation of a license to practice naturopathy for the procuring of a "criminal abortion." This law was in effect until 1953. Obviously, in 1950, the date of the offense herein charged, the legislature had indicated the opinion that there was a criminal abortion statute. The 1953 amendment concerning naturopathy contains a new and wholly different definition of abortion. The majority asserts that the definition of abortion in the medical practice act which is prefaced by the words "when used in this act", modifies the manslaughter act. Would they now say the same concerning the definition in the naturopaths act which contains a different definition of abortion "for the purposes of this act"? (3) The laws of 1953 concerning chiropractors also defines abortion differently from the definition contained in the medical practice act. Did that act also amend the manslaughter act? Applying the reasoning of the majority opinion, such a weird result would appear to follow. (4) In 1953 the legislature enacted Chapter 540 providing in part that whoever shall maintain a place

"where any person shall administer to any woman, whether pregnant with child or not, any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy a child of such woman, unless the same shall be necessary to preserve the life of such woman or unless such is done for the relief of a woman whose health appears in peril because of her pregnant condition after due consultation with a duly licensed medical or osteopathic physician and surgeon under the conditions and restrictions prescribed in subsection (2) of

section 54-931 or section 54-831, O.C.L.A., is guilty of maintaining a nuisance. * * *'' Oregon Laws 1953, ch 540.

The section concludes as follows:

" * * * This act shall not be deemed to modify, alter or amend by implication any of the provisions of section 23-408, O.C.L.A., nor to affect prosecutions thereunder.''

This section conclusively establishes the intent of the legislature that prosecution under OCLA, § 23-408, the manslaughter act, are still maintainable, notwithstanding the provisions of OCLA, § 54-931. The obvious purpose of the last sentence of the 1953 act was to make it clear that the prosecutions which were then notoriously pending under the manslaughter act were not affected by other legislation.

Section 23-408, OCLA, concerning manslaughter by abortion, is incorporated without material change in the Oregon Revised Statutes and appears therein as section 163.060. The Revised Statutes were adopted *as law.* Oregon Laws 1953, chapter 3. From these facts an inference must be drawn that the legislature recognized the section in question as law and intended that OCLA, § 23-408, as written, should remain unchanged. See *Goff v. Hunt,* 6 NJ 600, 80 A2d 104; *Benschoter v. Hakes,* 232 Iowa 1354, 8 NW2d 481; *Burdette v. Municipal Employees, etc., Newark,* 129 NJL 70, 28 A2d 93; *State v. Du Pont,* 3 Terry (42 Del) 540, 40 A2d 453; *Doggett v. Hooper,* 306 Mass 129, 27 NE2d 737; *Greene v. Hudson County Board of H. & V. Statistics,* 19 NJ Super 453, 88 A2d 662. The necessary conclusion is that the professional code must not be construed so as to "permit" an act to be done which would be a violation of the manslaughter

statute. It only provides that there shall be no revocation of a license by the board if the abortion is performed under the conditions set forth in the professional code.

The consequences which necessarily follow from the adoption of a particular construction of statute frequently throw light on the propriety of the proposed construction. Assuming the majority opinion to be law, let us see what is the state of the law on the subject of abortions under that opinion. The argument of the majority is that the definition of an abortion which is found in the medical practice act must be read into the manslaughter act. Hence the manslaughter act would be altered only insofar as the medical practice act has altered it. Under the majority theory, any person who is not a physician or surgeon is subject to the prohibition of the manslaughter act, but according to that opinion, it would appear that there are also physicians and surgeons who would be subject to the prohibition of the manslaughter act as written, because the medical practice act excludes them from its purview. In the medical practice act it is provided: "This act shall not be construed to affect or prevent the following:" Then follow 15 separate categories of practice which are not affected by the medical practice act. Among the types of practice which are not affected by the act are:

"* * * (2) the practice of medicine and surgery by a duly appointed member of the resident staff, or by an interne while actually serving as such, in any legally incorporated hospital in this state recognized as standard by the order of the state board of medical examiners; or (3) the practice of medicine and surgery by any one duly licensed so to practice in a neighboring state, who resides near the

> boundary of this state, and whose practice extends into this state, but who does not maintain an office or appoint a place to meet patients or receive calls within this state or (4) the meeting in this state of any legally licensed practitioner of medicine and surgery of any other state or country with a duly licensed practitioner of medicine and surgery in this state, for consultation; or (5) the furnishing of medical or surgical assistance in cases of emergency requiring immediate attention; or (6) the domestic administration of family remedies; or (7) the practice authorized by section 54-824, by osteopathic physicians and surgeons; or (8) the practice of dentistry, pharmacy, optometry, chiropractic, naturopathy, chiropody or cosmetic therapy, by any person legally authorized by this state * * *; or (15) the practice of physiotherapy, electrotherapy or hydrotherapy carried on, by or under the direction of duly licensed practitioners of medicine and surgery or osteopathy and surgery or chiropractic, or any other method of practice which may hereafter become legalized in this state." OCLA, § 54-902.

In addition to the foregoing classifications of practice exempted from the act, certain military physicians and surgeons are also exempted.

Thus it appears, for example, that certain members of the resident staff of a hospital, practicing in this state, are not within the purview of the medical practice act, and, according to the theory advanced in the majority opinion, they would therefore be subject to the prohibition of the manslaughter act.

Now, the majority decision goes only to this extent; that a physician cannot lawfully be indicted or tried under the provisions of the manslaughter statute for performing an abortion as now defined in the medical practice act, if it is performed for the relief of a woman whose health is in peril because of her

pregnant condition, and after consultation. Under the medical practice act, "abortion" is so narrowly defined as to cover only cases in which a physician causes the "expulsion of the foetus at a period of uterogestation so early that it has not acquired the power of sustaining an independent life; * * *." OCLA, § 54-901. The only act for which a license may be revoked is the procuring of an abortion as defined in that act. Hence, under the majority rule, if the abortion is caused after the foetus has acquired the power of sustaining an independent life, it is not an abortion at all, within the meaning "of this act", to wit, the medical practice act, and the physician would be subject to the prohibitions of the manslaughter act.

Under the medical practice act it is conclusively presumed that the foetus has not acquired power of sustaining an independent life earlier than 150 days after gestation. Under the majority opinion, a licensed physician could rely upon that conclusive presumption and be sure that for 150 days the medical practice act would apply, and hence, the manslaughter act would not apply. But must a physician, at his peril, determine the exact date on which gestation occurred, that is, on which the impregnating intercourse was had, in order to know whether he will be protected by the medical practice act, or may be liable to conviction for manslaughter?

Again, under the medical practice act, whether the foetus has acquired power to maintain an independent life after 150 days and before 240 days must be determined as a matter of fact on evidence in each case, aided only by a disputable presumption. If an abortion was performed after 150 days, then, under the theory of the majority, whether the act was regulated by

the medical practice act, or by the manslaughter act, might depend upon evidence of the circumstances which became available only after the abortion had been performed. Guilt or innocence might depend upon the decision of a jury, based upon evidence occurring after the act charged had been performed.

A construction of statutory provisions which would subject some Oregon licensed physicians to prosecution for manslaughter, while subjecting others only to revocation of license for a similar act, runs dangerously close to a violation of the equal protection clause of the Federal Constitution. Furthermore, if a construction is adopted which would require a person to search through the intricacies of the provisions, exceptions and provisos of a civil statute for the regulation of medical practitioners in order to determine whether a crime has been committed under the simple provisions of the manslaughter act, then, there is grave doubt as to whether any person could, under any circumstances, be convicted under the manslaughter statute.

If the members of this court, after argument, and reargument, and full consideration, are unable to agree as to what constitutes manslaughter by abortion, and as to who is prohibited from violating the manslaughter act, it seems clear that the statute, as construed in the majority opinion, would be one which "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." A valid criminal law must declare with reasonable certainty what acts it intends to prohibit. *State v. Simons and Blanchard,* 193 Or 274, 238 P2d 246. On the basis of constitutional law, the United

States Supreme Court has made the Oregon rule more specific and binding.

> "* * * a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Constr. Co.,* 269 US 385, 391, 70 L ed 322, 328.

We have been led into a discussion of this abstruse maze of allegedly conflicting statutory provisions, simply because of a basic error in reasoning. That error is found in the fact that a civil regulatory statute, vesting limited jurisdiction in a medical board, and enacted for the self-government under law of the medical profession, has been tortured into a complex amendment or repeal of the plain terms of a felony statute, the existence of which, was known to the legislature, and which was reenacted in 1953 by Oregon Revised Statutes. It may be that in its wisdom the legislature should harmonize the two statutes, one civil and one criminal, but this appeal is to a court, and we may not say that the legislature cannot do what it clearly has done when it established different tests to be applied by a board of physicians in determining whether to oust a doctor from his profession, from those which are to be applied in determining criminality.

In the course of argument solicitude has been expressed for the members of a great and honorable profession. It is feared that ethical physicians will be misled by reason of the difference between the civil and criminal procedures. If this court will declare, as I think it should, that the manslaughter act means just what it says, and that its violation is criminally

punishable, no doctor will ever be misled and no honorable doctor will violate its plain terms. It is only the decision of this court which attempts to fuse the provisions of two different statutes into one, which will create confusion worse confounded. In my opinion, a guilty man has been freed, and contrary to every sound rule of construction, a law has been emasculated, if not totally destroyed, by the decision in this case.

Mr. Justice LUSK and Mr. Justice WARNER join in this dissent.